## SALANT et al. v. FOX et al.

(Circuit Court of Appeals, Third Circuit. January 3, 1921.)

No. 2563.

**1. Contracts ☞147 (1, 2), 169—Unambiguous contract construed from terms.**
   The cardinal rule in construing a contract is to ascertain the intention of the parties, and where its terms are clear and unequivocal, the intent must be determined from its contents alone; but where the language is ambiguous, or susceptible of several significations, its meaning may be found in the subject-matter viewed in the light of the circumstances.

**2. Contracts ⬥143—Terms expressing workable arrangements cannot be added to.**

Where the language of a contract expresses a reasonable and workable arrangement, such as men in the respective positions of the parties would enter into with reference to the subject-matter in the light of the circumstances, the court cannot go outside of its terms to find something different or better, which it might think the parties intended, but had not expressed.

**3. Contracts ⬥201—Held to require specified deliveries in each month without credit for excess in previous months.**

In a contract whereby a shirt manufacturer having a government contract secured the agreement of another to devote his factory exclusively to finishing shirts from material cut by the manufacturer, a provision requiring a stated amount of material to be furnished before the work began, and thereafter an amount to be furnished each month equal to the number of finished shirts received during the preceding month, requires the manufacturer to deliver each month the amount so determined, without crediting on such deliveries the excess of materials previously delivered.

**4. Contracts ⬥172—Provision for payments for deficiency in delivery held not to relieve from undertaking to deliver.**

In a contract which required plaintiffs to deliver to defendants material to be made into shirts equal in amount to the number of finished shirts shipped by defendant during the preceding month, a provision requiring plaintiffs to pay defendants a stated sum if the material delivered fell below the minimum weekly requirement was a provision for the benefit of defendants, of which they alone could avail themselves, and did not relieve plaintiffs from performance of their obligation to deliver the quantities agreed.

**5. Contracts ⬥278(1)—Plaintiff's breach held to justify nonperformance by defendant.**

Where plaintiffs failed to deliver to defendants the stipulated quantity of shirt material, to be made into shirts by defendants for plaintiffs, plaintiffs cannot recover for defendants' subsequent refusal to perform the contract, though, under the influence of a rising market, defendants took advantage of the situation to get out of the contract.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by Gabriel Salant and others, trading as Salant & Salant, against Will S. Fox and another, trading as Fox & Moore. Judgment for defendants, and plaintiffs bring error. Affirmed.

Owen J. Roberts, of Philadelphia, Pa., for plaintiffs in error.
Ruby R. Vale, of Philadelphia, Pa., for defendants in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and BODINE, District Judge.

WOOLLEY, Circuit Judge. The plaintiffs were clothing manufacturers of New York City under contract with the United States Government for the manufacture of shirts. The defendants were contractors, and owners and operators of a shirt factory in Schuylkill County, Pennsylvania. In August, 1917, the parties entered into a written contract whereby the plaintiffs, shirt cutters, undertook to ship the defendants, shirt finishers, a given number of shirt cuttings by the first of the next month, and monthly thereafter a number of

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cuttings equal to the defendants' finishings of the preceding month, and the defendants undertook to make the same into shirts. Both parties duly embarked upon the contract. Later, a rising market and congested freight conditions disturbed its performance. The manufacturers did not furnish cuttings in each month equal to the contractors' finishings of the preceding month, and the contractors did not finish shirts in each month in the number they had agreed to do. Thereupon each charged the other with breach of the contract. The manufacturers sued. On the contract as interpreted by the court, verdict was directed and judgment entered for the defendant contractors. The plaintiffs sued out this writ of error.

The matter under review concerns the interpretation of the contract. Its material clauses—with their controlling provisions italicized by us—are as follows:

"2. The contractor (defendants) *shall devote the factory building* owned by them and the machinery contained therein *exclusively* to the manufacture of shirts *for the manufacturers* (plaintiffs) giving them the *entire* output of said factory, *which shall be not less than* 800 dozen weekly during the period of this agreement. They shall do no work whatsoever for any other concern, nor sell, assign, lease or sublet said factory or any rights that they may have to said factory."

"3. The manufacturers shall ship to the contractor *not less than 3,000 dozen* cut shirting material before the 1st. day of Sept., 1917. After that date they shall make to the contractor shipments of cut material every month in quantity *equal to the amount of finished goods received by them from the contractor during the preceding month.*"

"13. In case the manufacturers ship the contractors less than at the rate of 800 dozen a week, the contractors shall be entitled to receive eight cents per doz. for the deficiency."

[1] In looking for the meaning of this contract we are controlled by no novel rules of interpretation. The cardinal rule in every case is to ascertain the intention of the parties. The law presumes that the parties understood the import of their contract and that they had the intention which its terms express. When a contract is clear and unequivocal its meaning must be determined by its contents alone; another meaning cannot be added by implication or intendment; but where the language is ambiguous or susceptible of several significations, its meaning may be found in the subject matter, viewed in the light of the circumstances under which it was entered into. 6 R. C. L. 834–849; 13 Corpus Juris, 524.

If we had been the first called upon to interpret this contract we should have regarded its language as clear and unambiguous, and have construed it accordingly; but as the contract has been submitted to another court, where, between counsel and the court, it has given rise to three radically different interpretations, we must assume that its language is ambiguous and is susceptible of different meanings.

At the trial the plaintiffs' view of the contract was that after getting under way, their obligation to supply the defendants with cuttings was fixed by the amount of the defendants' finishings of the preceding month, as the contract expressly provided, but that, failing in any month to supply cuttings equal to finishings of the preceding month, they were entitled to credit the deficiency with cuttings supplied in any

previous month in excess of the contract requirement. By this construction the plaintiffs would be exonerated of a breach under the facts which show that their short deliveries for several months would, if credited with the excess of previous deliveries, arise to substantially full deliveries for all months.

The construction urged by the defendants was that the plaintiffs were obligated to make an initial shipment of 3,000 dozen cuttings, and that, thereafter, in addition to making deliveries of cuttings in every month equal to the defendants' finishings of the preceding month as provided by the express terms of the contract, the plaintiffs were required to maintain, either in the defendants' factory or in transit, at all times, a reserve, or, as they termed it, a "water level" of 3,000 dozen cuttings,—the number which the plaintiffs were required to deliver initially.

The court's view of the contract was that there were really two undertakings of the plaintiffs, one including the other.

"The one, which may be called the master obligation, was to keep the defendants supplied with sufficient material to enable them to meet their obligation to turn out a minimum of 800 dozen shirts per week; their other was subsidiary to this, and intended not to qualify or lessen it but to give practical assurance that it would be met."

We gather that the learned trial judge construed the undertaking of the plaintiffs as an obligation on their part, in consideration of the entire output of the defendants' factory, to keep the defendants supplied with material in any event. That was the master obligation. The subsidiary obligation was that expressed by the terms of the contract as to the method of the performance of this major obligation.

[2] It is to be observed that each of these interpretations was arrived at by implying something which it was thought the parties intended but had not expressed. As we read this contract we think its language expresses a reasonable and workable arrangement, such as men in the respective positions of the parties would enter into with reference to the subject matter in the light of the circumstances. If the writing itself shows a reasonable undertaking of the parties and indicates that it embraces all they intended, that undertaking is the contract. We cannot go outside of its terms to find something different or better.

We are of opinion the contract discloses in its terms all that the parties intended.

In order to carry out their contract with the United States Government for the manufacture of shirts, the plaintiffs cut the material and made sub-contracts for finishing the same with a number of concerns having factories. To this end they contracted with the defendants for the entire output of their factory. From the very nature of the work to be done the defendants could not finish shirts until the plaintiffs had supplied them with material. Therefore it was agreed that before work should start, that is, before the first of September, 1917, the plaintiffs should place with the defendants "not less than 3,000 dozen cut shirting material." This provided for stocking the factory and setting the machinery at work on the twenty-four in-

dividual operations required to make shirts in quantity. This provision we think embodied an independent, initial, pre-work condition, which when performed fulfilled this one of the plaintiffs' contract obligations. It stood by itself, however, and was in no way connected with their obligation to make future deliveries. The plaintiffs performed this obligation—expressed in terms of a minimum delivery—by shipping the defendants not 3,000 dozen but 4,245 dozen. Then the defendants started to work. Obviously their work of finishing shirts could be continued only so long as the plaintiffs delivered cuttings. Fully anticipating this the parties agreed that:

"After that date," (that is, after the date before which the plaintiffs were required to make their initial bulk delivery of material,) the plaintiffs shall "make to the contractor shipment of cut material every month in quantity equal to the amount of finished goods received by them from the contractor during the preceding month."

Just what did the parties mean by this provision? Their meaning, we think, is made clear by the rest of the contract. The defendants had surrendered their entire factory to the work of the plaintiffs under a minimum undertaking on their part to turn out 800 dozen finished shirts per week. Whatever was the maximum output of the factory, this evidently was the defendants' estimate of the minimum capacity at which it would yield a profit, considered with reference to machinery, labor, fuel, and other conditions. The remaining factor was that of materials. This was met and covered by the plaintiffs' two delivery undertakings. Under these, so long as they were performed, the defendants had in their own hands the entire situation as to their factory output. They had 3,000 dozen cuttings initially delivered as a stock of material on which to start, and they had as a factor of safety all cuttings delivered above this minimum. Aside from this the defendants had another factor of safety in the obligation of the plaintiffs to deliver cuttings monthly equal in number to their finishings of the preceding month. They were thus in complete control of their monthly deliveries of finished shirts, if they could depend at all times on the plaintiffs furnishing them with cuttings pursuant to the standard agreed upon. If in any month the defendants' finishings were small (but never less than 800 dozen per week) they could not complain if the plaintiffs' deliveries of cuttings in the next month were correspondingly small. That was their affair. In another month the defendants could, if they chose, speed up and enlarge their output of finishings by using the excess of cuttings previously delivered so long as they could be assured of monthly deliveries of cuttings always equal to their monthly output of finishings.

[3] Constancy in the supply of materials was therefore the essence of the contract. As they had surrendered their factory exclusively to the use of the plaintiffs, the defendants were entitled to and by clear expression had provided for supplies sufficient to keep it running at capacity. To this the plaintiffs agreed. The test of performance of the plaintiffs' obligation therefore was not the delivery of cuttings in excess of the required number in any given month but was the regular delivery of cuttings in each month

equal at least to the defendants' finishings of the preceding month. The contract discloses no purpose of maintaining a water level of reserve material in the hands of the defendants but it does disclose an undertaking on the part of the plaintiffs to maintain an inflow of cuttings equal to the defendants' outflow of finishings. Any excess of deliveries made by the plaintiffs in any month above the required minimum—and it is evident that in drawing this contract both parties were dealing with minima—was optional with the plaintiffs, but the excess when made became a factor of safety enuring to the benefit of the defendants, of which they could take advantage to fill their factory and raise their output. This evidently was what both parties intended, and, as shown by the early months, strove to do. The object of both was to make as many shirts and as much money as possible. Such we think were the intentions of the parties as expressed by the language they used in their written contract without resort to implications.

[4] The thirteenth paragraph of the contract providing for payment to the defendants in case of a deficiency in monthly deliveries of cuttings did not operate to relieve the plaintiffs of their undertaking to make deliveries in the number and at the times specified, nor did it relieve them from liability for breach of that undertaking. It was a provision made for the benefit of the defendants, of which they alone could avail themselves on occasion.

[5] The trouble began when, because of freight conditions, the plaintiffs fell short in monthly deliveries. While, under the influence of a rising market, the defendants took advantage of the situation with ill-concealed anxiety to get out of the contract, we are nevertheless of opinion, that under our interpretation of the contract denying the plaintiffs the right to credit a short delivery in one month with an excess delivery in another, the trial court committed no error in finding that the plaintiffs had breached the contract. Therefore we direct that the judgment below be affirmed.