**GENERAL SUPPLY CO. et al. v. MARDEN, ORTH & HASTINGS CO., Inc., et al.**

(Circuit Court of Appeals, Third Circuit. November 28, 1921.)

No. 2665.

1. **Contracts ⬅147(1, 2), 169—Cardinal rule of construction to determine intention of parties; intention determinable from language; surrounding circumstances may be considered.**

The cardinal rule in construing a contract is to ascertain the intention of the parties, and when a written contract is clear and unequivocal, its meaning must be determined by its contents alone; but where the language is ambiguous, or susceptible of several significations, its meaning may be found in the subject-matter viewed in the light of the circumstances under which it was entered into.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] 21 Sup. Ct. 38, 45 L. Ed. 106.

**2. Contracts ⚖=10(4)—Mutual agreements in contract held valid consideration for each other.**

A provision of a contract by which plaintiff, owner of a chemical plant, agreed to devote its entire plant for a stated term to the manufacture of certain chemicals for defendant, *held* a sufficient consideration for a further provision by which defendant agreed to take and pay for a stated monthly tonnage of such chemicals, so that the contract was not void for lack of mutuality.

**3. Contracts ⚖=217—For manufacture of war products held terminable on notice after close of war.**

Where a contract for the manufacture by plaintiff for defendant of a stated quantity of chemicals monthly was made by both parties in view of the abnormal demand and prices created by the war, though the contract named a stated term, a provision that such quantity should be produced "for the present and until further notice" *held* to give defendant the right to terminate it on reasonable notice.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Action at law by the General Supply Company and others against the Marden, Orth & Hastings Company, Inc., and another. From the judgment, plaintiffs bring error. Reversed.

L. Edward Herrmann and Wall, Haight, Carey & Hartpence, all of Jersey City, N. J. (Thomas G. Haight, of Jersey City, N. J., of counsel), for plaintiffs in error.

John M. Emery and Parker, Emery & Van Riper, all of Newark, N. J. (Chauncey G. Parker, of Newark, N. J., of counsel), for defendants in error.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. This is an action on a written contract. Under its interpretation of the contract the court directed a verdict for the plaintiffs in the sum of $12,512.18, subject to a possible deduction of $3,000 according as the jury should or should not find this item a proper credit on the defendants' indebtedness, and submitted to the jury a counter-claim of the defendants for $50,000, made up specifically of items for raw materials belonging to the defendants in the possession of the plaintiffs at the termination of the contract, valued at $38,416.03; work in process $2,620.24; containers, carboys, drums, etc., $7,727.76. The jury rendered a verdict for the plaintiffs for $12,-512.18 with interest, the amount directed, without deducting a $3,000 credit, and for the defendants for the first two items in the amount of their counter-claim and for the third item in the lesser amount of $3,914.88, or a total of $44,951.15 without interest. To the judgment entered on this verdict the plaintiffs alone sued out a writ of error, challenging as insufficient—because of the court's alleged misinterpretation of the contract—that part of the judgment rendered in their favor (without challenging the verdict for the defendants) and alleging error also in rulings on the evidence arising mainly from the construction which the court gave the contract.

On this review we are concerned primarily—indeed, almost entirely —with the interpretation of the contract, for according as the contract is construed the remaining matters assigned as error grow in magnitude or entirely drop out of view.

[1] In looking for the meaning of this contract we are controlled by no novel rules of interpretation. The cardinal rule in every case is to seek the intention of the parties. The law presumes that the parties understood the import of their contract and that they intended what its terms express. When a contract is clear and unequivocal its meaning must be determined by its contents alone; another meaning cannot be added by implication or intendment; but where the language is ambiguous or susceptible of several significations its meaning may be found in the subject matter, viewed in the light of the circumstances under which it was entered into. Salant v. Fox, 271 Fed. 449 (C. C. A. 3d).

[2] If we had been the first called upon to interpret this contract we should have regarded its language, though quite inartificial, as unambiguous. But the contract has been submitted to another court, where the contending parties, giving it different interpretations, each urge that the contract as interpreted by the other is such that no reasonable man would ever enter into. As we read the contract we regard its language as expressing a reasonable and workable arrangement such as men in the respective positions of the parties might enter into with reference to the peculiar subject matter and in the light of the unusual circumstances surrounding the transaction. If the writing itself shows a reasonable undertaking of the parties and in this respect shows what they intended and all they intended, that undertaking is the contract. We cannot go outside of its terms to find something different, better, or even more reasonable. With these observations, we turn to the contract to see what the parties intended in the circumstances.

The capital circumstance was that the war was on. Production alone was all that was needed for both parties to make money. The defendant corporation, to which we shall refer as the Chemical Company, was a large dealer, and, through subsidiaries, a manufacturer of chemicals, with ample capital. The plaintiff corporation, to which we shall refer as the Supply Company, had a chemical plant at Perth Amboy, New Jersey. The stock of this corporation was mainly owned and the plant was operated by its president and treasurer. The plant was a small affair, costing about $6000, the financial resources of the corporation were meagre, and the experience of those who conducted its business was not extensive. In a word, the Supply Company had a plant and little money; the Chemical Company had money and wanted a plant. The desire of both was—more production. Moving to this common object, the parties entered into the contract of June 3, 1916, now in suit, whereby the Supply Company undertook for a period of fourteen months—later extended to thirty-six months—to devote its factory exclusively to the manufacture of chemicals from raw materials exclusively supplied by the Chemical Company and to sell the same when manufactured exclusively to the Chemical Company at a profit to the Supply Company of 10 per cent. on a cost reckoned on a basis agreed

upon. Cost as agreed upon included monthly salaries of $150 to each of the operating officers of the Supply Company and a monthly amortization of advances by the Chemical Company for the enlargement of the plant. (Later, the salaries were paid in part and the amortization in part cared for before suit and balances of both were included in the verdict.)

Both parties thereupon embarked upon the performance of the contract; the Supply Company enlarging its plant and increasing its production and the Chemical Company supplying raw materials and taking all finished products the Supply Company turned out.

At times, the Chemical Company showed an inclination to lag. Thereupon, in March, 1917, the Supply Company complained to the Chemical Company that it was not delivering raw materials and supplying orders sufficient to enable it to make a "minimum monthly output (of) 7 tons of Aniline Oil, 4 tons of Sulphonilic Acid, and 4 tons of Orange II," a production to which the Supply Company regarded itself entitled as a base for its minimum monthly profit. The Chemical Company thereupon increased its monthly material deliveries and orders to the Supply Company and maintained the same quite consistently until July 1, 1918, when, on a declining market, it decreased its deliveries and orders. A little later there occurred another circumstance which evidently the parties had in view and against which, we think, they had protected themselves in the terms of their contract, which was, that some day the war would end and with it the abnormal demand for production and the unusual opportunity to make money. That day came on November 11, 1918. The Chemical Company then ordered the Supply Company to cease manufacturing on January 1, 1919. There had yet to run six months of the term and there remained a large amount of unfinished supplies in the hands of the Supply Company.

The Supply Company, construing the contract as imposing an obligation on the Chemical Company to deliver raw materials and furnish orders in an amount sufficient to enable it to make a certain minimum monthly commission or profit, thereupon brought this suit to recover damages in the sum of $61,367.88. Of this amount the only sum with which we are presently concerned is $42,512.43, made up of two items: First, $18,174.21, being the difference between payments made and commissions or profits due the Supply Company under the contract throughout its term; and second, $24,338.32, being commissions or profits which the Supply Company claims it would have earned if it had been permitted to convert into finished products the raw materials on hand January 1, 1919, when the Chemical Company ordered manufacturing to cease. Its right to recovery rests on the construction of the contract in general and on the construction of one paragraph in particular. This paragraph reads as follows, the italics being ours:

"The parties of the second part (the Supply Company and its officers) agree to use their best efforts to produce the products *requested* by the party of the first part (Chemical Company) of the party of the second part to be produced (sic), and agree to use their best energies in equipping, at the earliest possible date, and at the lowest possible cost, their plant for the production of the products *asked for* by the party of the first part, *which products for*

*the present and until further notice* shall be the increase of the Perth Amboy plant so as to produce approximately seven (7) tons per month of Aniline Oil, four (4) tons per month of Sulphonilic Acid, U. S. P. and four (4) tons per month of Orange No. 2."

At the trial, wholly different interpretations of this paragraph were advanced by the parties. We believe that both interpretations were wrong because founded on the common error of both parties in looking only to the paragraph for the consideration of the Chemical Company's undertaking to take chemicals in a named monthly tonnage. The construction placed by the Supply Company upon the paragraph was that the Chemical Company "asked for" and thereby promised to take "the products (of the enlarged plant) * * * which * * * shall be" the monthly tonnage named.

We think this is a correct interpretation of the undertaking of the Chemical Company. It was quite reasonable for the Supply Company to ask and require the Chemical Company to take chemicals in an amount upon which it could rely, for a time at least, as a basis for profits. When pressed to show the consideration moving from the Supply Company for the Chemical Company's undertaking to take a definite amount monthly the Supply Company did not go outside the paragraph but cited that clause in the paragraph where it promised, quite indefinitely, to use its best efforts so to increase the plant as to produce the quantity asked for by the Chemical Company. The Chemical Company, also restricting itself to the paragraph, made the quite pertinent reply that a promise by one party to do its best to make and deliver is not a valid consideration for a promise by the other to take and pay for a named monthly amount, there being in such case a lack of mutuality of consideration. Yielding to the contention of the Chemical Company the court, likewise confining itself to the paragraph in search for a valid consideration for the Chemical Company's obligation to take a named tonnage monthly, held that as the Supply Company had not promised to produce chemicals in any given amount, the promise of the Chemical Company to take chemicals in a named amount was without consideration and was, therefore, not enforcible.

[3] If the trial court in interpreting the contract had been restricted to this one paragraph there would be no answer to the defendants' contention or to the court's construction. But we feel that a valid consideration for the Chemical Company's undertaking to take the monthly tonnage named in the paragraph may be found elsewhere in the contract and that such a consideration is found in the Supply Company's surrender of its plant and the devotion of the energies of its two officers exclusively to production for the Chemical Company. We think such complete surrender of the Supply Company's plant to the Chemical Company's uses was, without more, a valid consideration moving from the Supply Company for the promise of the Chemical Company to take a named monthly tonnage. It was the precise thing which the Chemical Company asked for, and got by tying the Supply Company by terms that held it fast. Of course, it had to give something in return and this it did by promising to take monthly the products of the plant in a named amount, certainly beginning with the

signing of the contract on June 3, 1916, and continuing, the Supply Company urges, until the end of the term on June 3, 1919. It is just here that we leave the position of the Supply Company and give the contract an interpretation which for various and obvious reasons neither party advanced. It is this:

While this contract partook of a business adventure in which the common object of both parties was enlarged production to meet an abnormal market due to war, it was apparent to both that at some time the war would end and with it the market. Therefore the Chemical Company in promising to take the increased production of the enlarged plant in the amount of 7 tons plus 4 tons plus 4 tons of different chemicals undertook to do so only "for the present and until further notice." And it gave that notice by ordering production to cease on January 1, 1919.

In the light of the times and of the business purposes of the parties, we see in this agreement nothing so unreasonable as to make us believe that it was not what the parties intended. Certainly it was what they said. Therefore, under our interpretation of the contract we are of opinion that, on the case made by the pleadings and evidence, the Supply Company was entitled to receive, in addition to the amount of the verdict directed in its favor, the total of the monthly differences between commissions or profits it would have earned under the contract, had the Chemical Company supplied it with material and orders, and the commissions or profits it actually received, reckoned from the date of the contract to its termination by notice on December 31, 1918, which when translated into figures from the tabulated evidence, merely for illustration, would have been $9,228.21 and interest—with one possible deduction.

As to this possible deduction, it appears that during the last six months of 1918 the Chemical Company was disposed to be tardy in giving orders for and taking its monthly quantity of chemicals. The Supply Company complained. As a result the Chemical Company paid the Supply Company $1,500 for each of the months of November and December, 1918, designating the payment, without prejudice to the future construction of the contract, as "compensation  *  *  *  in an amount commensurate with the spirit of the contract." The trial court left the jury to say whether this sum of $3,000 was paid on the contract. The jury, under the court's interpretation of the contract disallowing minimum monthly commissions at any period, very properly found that it "was no part of the contract and therefore not an offset or credit to the amount above mentioned, $12,512.18," the amount of the verdict for the plaintiffs on other items. It is conceivable, however, that under the contract as interpreted by us a jury at another trial might find that the $3,000 was payment under the contract or on account of the Chemical Company's monthly shortages, or on certain of them. However that may be, the question should, under the new interpretation of the contract, be submitted again.

For the reasons we have given, and to the extent indicated, we find error in the judgment below. While a number, but not all, of the remaining matters assigned as error disappear from the case on our

construction of the contract, we desire to say, without discussion, that we find in the record no errors other than the one we have discussed. On that error we are constrained to reverse the judgment below and direct a new trial not inconsistent with this opinion.