## COREY v. ATLAS COAL & COKE CO.

(Circuit Court of Appeals, Sixth Circuit.   January 6, 1922.)

No. 3573.

1. **Appeal and error** ⬩1008(2)—**Findings of fact of trial court conclusive, where jury waived.**

Where a jury has been waived, a reviewing court must accept the findings of fact made by the trial court, if sustained by any substantial evidence, as final and conclusive of the facts in controversy.

2. **Appeal and error** ⬩842(2)—**Question whether correspondence constituted contract of sale held before appellate court.**

Where court found "that no contract was made between the parties hereto for the sale of coal by the defendant to the plaintiff," and that there was no general custom to execute a formal written contract, and as a conclusion of law that "the correspondence * * * does not constitute or include a binding contract between the parties, and the defendant was not obligated to sell or deliver any coal to the plaintiff," and the finding as to the custom practically eliminated all facts extrinsic to the correspondence between the parties, the record presented for the consideration of the appellate court the question whether such correspondence constituted a contract, as claimed by the plaintiff, or, as claimed by the defendant, was merely a negotiation looking to the execution of a formal contract.

3. **Sales** ⬩87(1)—**No presumption cash payments intended for series of deliveries.**

The rule that, where a contract does not provide in terms for delay in payment, the presumption obtains that cash payment is intended, does not apply to a contract of sale providing for five separate deliveries of coal each week for one year.

4. **Sales** ⬩52(5)—**Finding of no contract to deliver sustained.**

In action for damages for breach of an alleged contract to deliver coal, evidenced by letters and telegrams, a finding that no contract was made between the parties *held* sustained by the evidence.

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by Charles C. Corey against the Atlas Coal & Coke Company. Judgment for defendant, and plaintiff brings error. Affirmed.

On the 9th day of November, 1916, Charles C. Corey brought an action against the Atlas Coal & Coke Company in the circuit court of Wayne county, Mich., to recover damages in the sum of $15,000 for breach of a certain contract in writing, dated August 9, 1916, by the terms of which the defendant agreed to sell and ship, to the order of plaintiff, five cars per week for one year of "Red Comet nut and slack" coal at 90 cents per ton, commencing September 1, 1916, which contract was evidenced by letters and telegrams exchanged between the parties. There are copied into this declaration and the amendment thereto, filed October 12, 1918, the letters and telegrams

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which, the plaintiff claims, constitute the written contract between him and the defendant.

The defendant, for answer thereto, denied that it had entered into any contract with the plaintiff, and averred that the letters and telegrams copied in plaintiff's declaration and amendment thereto were merely negotiations in reference to a proposed contract that was never actually made between the parties.

In pursuance of written stipulations, signed by counsel, the evidence was heard by a master, who made and reported to the court separate findings of facts and conclusions of law, and recommended that an order be entered finding no cause of action in favor of the plaintiff. To these findings and conclusions of the master exceptions were taken by both the plaintiff and the defendant. Attached to the master's report are copies of all of the telegrams and letters exchanged between the parties in July, August, and September of 1916, which the plaintiff claims constituted the written contract between them. The first 14 letters and telegrams, omitting the addresses of the respective parties, appear in the margin.[1] Some further letters were exchanged between the parties; the plaintiff asserting and the defendant denying that a contract had been made; but these other letters, copies of which are attached to the master's report, are in no way important in the determination of the question involved in this litigation.

Upon the hearing of the exceptions to the master's report, the District Court made special findings of fact and law, and entered a decree dismissing

---

[1] July 31, 1916.
Wisconsin Steel Company, Benham, Ky.: Wire price any part thirty thousand tons screenings yearly contract. C. C. Corey.

August 1, 1916.
C. C. Corey: Expect to have in two weeks five cars weekly for two years Red Comet two-inch slack. Can you use at ninety cents?
Atlas Coal & Coke Co.

August 3, 1916.
Mr. C. C. Corey—Dear Sir: Our mines at Benham have sent to us your wire inquiry of July 31st asking for price on 300 tons of screenings on yearly contract.

The Atlas Coal & Coke Company are disposing of our output and we understand that you have already communicated with them.
Very truly yours, Wisconsin Steel Company.

August 3, 1916.
Mr. C. C. Corey—Dear Sir: Your telegram addressed to Wisconsin Steel Company asking price on a contract, three hundred tons of two-inch slack per week has been referred to us, as we handle the entire output of coal produced by the above firm.

We expect to have about five cars of two-inch nut and slack per week that we may offer on a contract to extend for one or two years at a price of 90 cents per net ton mines. We would not be ready to begin shipments on this order if accepted for at least three weeks from date.

The situation in Eastern Kentucky is becoming more acute each day, owing to a car shortage that seems to be assuming alarming proportions, and, if it does not become better, we anticipate dollar or better slack in the near future.
Yours very truly, Atlas Coal & Coke Co.

August 7, 1916.
Atlas Coal & Coke Co.: We accept offer five cars per week one year Red Comet nut and slack ninety cents. C. C. Corey.

August 7, 1916.
Atlas Coal & Coke Co.—Gentlemen: We wired you today accepting your offer of contract for five cars per week for one year of Red Comet two-inch nut, pea and slack at a price of 90 cents per ton f. o. b. mines. We also note that you will not be ready to begin shipments on the order for at least three weeks. If anything should occur in the meantime we would appreciate your

plaintiff's petition at his cost, to all of which exceptions were taken by the plaintiff. The defendant also filed exceptions to the overruling by the court

---

advising us as we will need the coal. Please draw up a form of contract and send to us for signature.

Yours very truly,                                              C. C. Corey.

August 7, 1916.

Mr. C. C. Corey—Dear Sir: We are in receipt of your following telegram:

"We accept offer five cars per week one year Red Comet nut and slack ninety cents."

Will it be agreeable for you to have shipments begin at about September 1st and shall contract be made, dating from that period?

In making steam contracts through jobbers, we require the name of the final consignee.

Kindly supply this information as well as the delivery railroad, in order contract records may be properly enumerated.

Yours very truly,                                        Atlas Coal & Coke Co.

August 9, 1916.

Atlas Coal & Coke Co.—Gentlemen: Acknowledging your letter of the 7th in reference to the contract on Red Comet nut and slack, this coal will be consigned to the Elevator Cash Coal Company, Newcastle, Indiana, via L. E. & W. We will want the shipments to start at the earliest possible moment if it can be arranged at all prior to September 1st, and you may date the contract either the date you make it up, or the date of our wire, August 7th.

Yours very truly,                                              C. C. Corey.

August 10, 1916.

Mr. C. C. Corey—Dear Sir: Your letter of the 9th inst. received. We do not find the Elevator Cash Coal Company at Newcastle, Indiana, listed in commercial rating books. Is this a new concern?

We would also like to have some information regarding your financial responsibility. The line of credit that you desire, approximating between $800 and $900 per month, is hardly justified on your cash investment in your business, which is reported at $1,600. Furthermore, we have had some very unpleasant experiences with brokers in Detroit, where it seems to be the fashion when coal is not shipped exactly as it is ordered, a condition frequently impossible to fulfill through traffic or mining complications, to hold out payment of the outstanding account. One gentleman in Detroit literally stole from us the value of two cars of coal on such a false pretext, and before we engage in any business transactions with jobbing firms in Detroit, we want all these matters understood in advance. You are a total stranger to us, and we do not want to have trouble later on.

This is going to be a very trying season and prices on coal are going to be much higher than contract figures, and we want to be assured that when we furnish coal during a period of high prices that the contract will be lived up to and the coal taken in agreed quantity when the situation changes and the market should go the other way.

Yours truly,                                             Atlas Coal & Coke Co.

August 11, 1916.

Atlas Coal & Coke Company—Gentlemen: We have your communication of August 10th, and in reply beg to state that the Elevator Cash Coal Company is a wholesale and retail concern located at Muncie, Indiana. Any further information you may desire relative to this concern can probably be obtained from Dun's or Bradstreet's. We have reason to know that they are absolutely financially responsible.

As to our own financial responsibility, we are inclosing a signed statement, and in addition to this would respectfully refer you to Williams & Peters, Buffalo, N. Y.; Pittsburgh Coal Company, Pittsburgh, Pa.; Smokeless Fuel Company, Cincinnati; Maynard Coal Company, Columbus, Ohio; or take up with Mr. Thomas Mordu, resident manager Chicago office, Castner, Curran & Bullitt.

We are in no way responsible for any unpleasant experiences you may have had with our competitors, and we take this means of informing you

of its exception to the master's report, and also exceptions to the court's third finding of fact and to its second conclusion of law.

---

that Detroit coal concerns as a rule do business in a straightforward, square manner, and should you have any reason to question the ethics of any concern located here, we would be pleased to have you report the matter to the Detroit Coal Exchange, the writer being vice president at the present time of this Exchange.

We expect to go into this deal with you on the square, and hope that you will take care of the business in a manner that will preclude any chance of complications arising during the life of the contract. There is no question of our taking the coal absolutely, no matter what may occur in the coal market, provided you ship us the kind of coal you are selling us and make reasonable effort to take care of the business in a satisfactory manner. If you desire any further information, we will be glad to furnish you same.

Trusting we may be favored with your contract blanks by return mail, we are

Yours very truly, C. C. Corey.

Atlas Coal & Coke Co.

Chicago, August 22, 1916.

Mr. C. C. Corey—Dear Sir: Your letter of the 19th inst. was not answered earlier, as the writer was in the mining fields in Kentucky for the past several days. I was in hopes that we would be able to take on your business early in September, but the car supply and labor shortage in the entire southeastern section of Kentucky have reduced the output fully 50 per cent., so that we are so far still behind on our orders that we are unwilling to take on new commitments before our old obligations are out of the way.

From present indications, we fear it will be impossible for us to take on the tonnage that you spoke for, namely, five cars per week. With the car supply running only 50 per cent. normal, it would be only disappointing you and your customer by extending promises that could not be fulfilled.

Instead of making an annual contract, would it not be better if we sold you ten or fifteen cars at a time? In this way, you would be in a better position to rely on other markets without placing too much dependence on your requirements from us.

Yours very truly, Atlas Coal & Coke Co.

August 25, 1916.

The Atlas Coal & Coke Co.—Gentleman: We note your letter of the 22d in which you intimate that it may be impossible for you to take care of the tonnage quoted on and accepted by us, and we consider that this is no time for you to give us such advice. Immediately upon receipt of your quotation of 90 cents per ton on five cars weekly for two years we got in touch with our party and closed the business, according to our wire August 7th. We feel that we have bought your coal, and inasmuch as we have resold it we must insist upon the full performance of the contract on your part. Our order is inclosed, confirming shipping instructions that were given you August 9th. We will expect you to begin shipments by September 1st.

Yours very truly, C. C. Corey.

August 26, 1916.

Mr. C. C. Corey—Dear Sir: Returning your order No. 2977. The car shortage and labor scarcity in Kentucky is such that it is impossible for us to take on your order.

Yours very truly, Atlas Coal & Coke Co.

August 30, 1916.

The Atlas Coal & Coke Co.—Gentlemen: You have already accepted our order for Red Comet nut and slack by wire, and unless you begin shipments accordingly we will buy the coal on the open market and charge our loss to you. Prompt action on your part is therefore imperative. Our order is being returned herewith.

Yours very truly, C. C. Corey.

Harry Helfman, of Detroit, Mich. (Lucking, Helfman, Lucking & Hanlon, of Detroit, Mich., on the brief), for plaintiff in error.

Henry C. Walters, of Detroit, Mich.( Walters & Hicks, of Detroit, Mich., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). No written waiver of jury appears of record; nevertheless the final decree in the District Court recites the fact that a jury had been waived by the parties, and there is no controversy now between counsel upon that proposition. On the contrary, when we assume that the trial of this case before the District Court was in pursuance of the statutory waiver of jury, we are but assuming a fact conceded by both counsel. It therefore becomes unnecessary to determine whether the stipulations entered into by counsel on June 13th and November 2d are, in effect, a waiver.

[1] Where a jury has been waived, a reviewing court must accept the findings of fact made by the trial court, if sustained by any substantial evidence, as final and conclusive of the facts in controversy. R. S. § 700 (Comp. St. § 1668); Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329, 45 L. Ed. 457; Mayes v. Jones & Co. (C. C. A.) 270 Fed. 121. There being no other questions of law arising in the trial of this cause, this leaves for the consideration of this court in this case but two questions:

(1) Are the findings of fact made by the District Court sustained by any substantial evidence?

(2) Do the facts found support the judgment?

There is no conflict in the evidence upon which the first, second, fourth, fifth, and sixth findings of fact are predicated. There is a conflict in the evidence in reference to the third finding that there was no general custom in the coal business in 1916 to execute a formal written contract before the consummation of a binding contract for the sale of coal. There is, however, substantial evidence in this record sustaining this finding. The seventh and last finding and the one vital to this case is as follows:

"I further find that no contract was made between the parties hereto for the sale of coal by the defendant to the plaintiff as alleged by the plaintiff herein."

[2] While the question of whether a contract has been made, where that fact is asserted by one party to the litigation and denied by the other, is, as a rule, a question of fact, to be determined upon all the evidence, nevertheless in this case the third finding of the court, that there was no general custom to execute a formal written contract in the coal business in 1916, practically eliminates all facts extrinsic to the letters and telegrams exchanged between the parties from the consideration of the court in determining this question. The District Court, recognizing that situation, found as the first conclusion of law that—

"The correspondence referred to in paragraph 2 of the findings of fact does not constitute or include a binding contract between the parties, and th defendant was not obligated to sell or deliver any coal to the plaintiff."

For the same reason the trial court also based upon its construction of these letters and telegrams its second conclusion of law, that the execution and delivery of a formal instrument embodying the terms of the contract was not intended by the parties hereto to be, and was not, a condition precedent or essential to the consummation of a binding contract between plaintiff and defendant herein.

The seventh finding of fact and the first conclusion of law are either both right or both wrong. Therefore this record does present for the consideration of this court, regardless of the seventh finding of fact, the question of whether these letters and telegrams constitute a contract, as claimed by the plaintiff, or, as claimed by the defendant, were merely negotiations looking to the execution of a formal contract as a condition precedent and essential to the consummation of a binding contract between the parties.

It is the claim of the plaintiff that defendant's letter of August 7th and the plaintiff's letter of August 9th constitute the contract upon which it relies for recovery, but in order to interpret correctly the meaning and effect of these letters it is necessary to consider, in connection therewith, the correspondence immediately preceding and immediately following these two exhibits.

Defendant's letter of August 7th does not unqualifiedly accept the terms contained in the telegram and letter sent by plaintiff to defendant on August 7th. The letter states that the defendant cannot begin shipments before September 1st. Demand is also made for the name of the consignee. While there is some evidence in this record that the name of the consignee is of no importance to the seller, nevertheless, as appears by defendant's letter of August 10th, the defendant did consider the personality of the consignee of serious importance to it, and states in no uncertain terms its reasons therefor. It is the defendant's mental attitude upon this subject that must control in determining whether the minds of the parties met, regardless of who the consignee might be. Plaintiff's letter of August 9th furnished to the defendant the information desired. Immediately following the receipt of this letter the defendant wrote the plaintiff the letter of August 10th, in which it stated that it could not find the Elevator Cash Coal Company, at Newcastle, Ind., listed in commercial rating books, and it also in this letter requested some information as to the plaintiff's financial responsibility, for the reason, as therein stated, that—

"The line of credit that you desire, approximating between $800 and $900 per month, is hardly justified on your cash investment in your business, which is reported at $1,600."

This letter also referred to past unhappy experiences with brokers in Detroit, one of whom, defendant claims, defrauded it out of two cars of coal. The defendant also explained in this letter its further reasons for demanding this information in the following language:

"This is going to be a very trying season and prices on coal are going to be much higher than contract figures and we want to be assured that when

we furnish coal during a period of high prices that the contract will be lived up to and the coal taken in agreed quantity when the situation changes and the market should go the other way."

This demand upon the part of the defendant was reasonable and right, especially in view of the fact, as found by the court, that this was the first business transaction between these parties, although there had been some correspondence earlier in the same year in reference to another proposed contract, which after some negotiations had been finally abandoned. These letters at best covered only the quantity and price. There was no reference in either telegrams or letters to the time of payment, strikes, car shortages, or other contingencies that might prevent or excuse the defendant from delivering this amount of coal. Therefore it is only fair to presume that, when the defendant wrote the letter of August 7th and inquired, "Will it be agreeable to have shipments begin at about September 1st and shall contract be made, dating from that period?" that defendant then contemplated and expected that a formal contract should be made covering all of these conditions and contingencies, some of which, as appears by defendant's first letter of August 3d, were then threatening the coal industry. That the plaintiff so understood this would appear from its letter of August 9th, in reply to defendant's letter of August 9th, in which he said:

"You may date the contract either the date you make it up or the date of our wire—August 7th."

The conclusion to be drawn from these two letters as to the intention of the parties to execute a formal contract is fully supported by practically all the other correspondence in this case. Plaintiff's first telegram to the Wisconsin Steel Company asked for price of screenings upon yearly contract. Defendant's letter in reply to this telegram of August 3d reads, in part:

"We expect to have about five cars of two-inch nut and slack per week that we may offer on a contract to extend for one or two years at a price of 90 cents per net ton mines."

Plaintiff's letter of August 7th, in reply to plaintiff's letter of August 3d, concluded with this statement:

"Please draw up a form of contract and send to us for signature."

Plaintiff's letter of August 11th concludes with this statement:

"Trusting we may be favored with your contract blanks by return mail."

It would therefore appear from all of this correspondence, without any conflict or dispute in any particular whatever, that it was the intention and purpose of both parties to this transaction to execute a formal written contract covering all the matters and things usual in contracts of this character, such as time of payment, car shortages, strikes, and the like, which contract the defendant did not intend to make until he had fully investigated the standing and character of the consignee and the financial responsibility of the plaintiff.

[3] It is claimed on behalf of the plaintiff in error that, where a contract does not provide in terms for delay in payment, the presumption obtains that cash payment is intended. Undoubtedly this rule would

apply to a contract for the sale and delivery of a single article or a number of articles at the same time, but such a presumption would hardly obtain in reference to a contract providing for five separate deliveries each week for one year. However that may be, it is clear that neither of these parties contemplated payment in cash for each carload of coal at the time of its delivery. In its letter of August 10th, the defendant stated that the plaintiff would require a line of credit between $800 and $900 per month, which the defendant thought not justified by plaintiff's cash investment of $1,600 in his business. The plaintiff's reply to that letter did not deny that he desired and expected this amount of credit each month. On the contrary, he inclosed a financial statement that is usually made by dealers when credit is desired. In this letter plaintiff also gave the names of coal dealers in Buffalo, N. Y., Pittsburgh, Pa., Cincinnati and Columbus, Ohio, and Chicago, Ill., as references to his financial responsibility. He also stated that the Elevator Cash Coal Company was absolutely financially responsible and referred the defendant to Dun or Bradstreet. This letter of the plaintiff would seem to be conclusive of the fact that he expected a monthly credit in the amount stated in the defendant's letter of August 10th. These letters are sufficient to show that neither of these parties then understood that a contract had been consummated between them by the letters of August 7th and August 9th, but, on the contrary, that there was still something further to be done, not only in reference to time of payment, but also to satisfy the defendant that it could safely extend this credit. It was for the defendant, acting in good faith, to say, after the receipt of this letter and financial statement, whether or not it was satisfied therewith.

[4] For the reasons above stated the seventh finding of fact made by the District Court is sustained by substantial evidence, and it necessarily follows that the court did not err in its first conclusion of law construing the effect of these telegrams and letters.

The judgment of the District Court is affirmed.