CANADIAN NAT. RY. CO. et al. v. GEORGE M. JONES CO.

Circuit Court of Appeals, Sixth Circuit. June 30, 1928.

No. 4985.

1. Sales ⬤⟶1(3)—Contract held unenforceable for indefiniteness as to price.

Contract for sale of coal to railroad, specifying price as that paid by other railroads during certain year, *held* unenforceable for indefiniteness as to price, in view of absence of contract with other railroads during such year, since in such case the method of fixing price failed.

2. Contracts ⬤⟶147(2)—Intention of parties is determined from their language.

Court may not inquire into the secret or unexpressed intention of one or both of the parties, but its sole duty is to determine the meaning of the language used, when considered in the light of the situation of the parties and the purposes and subject-matter.

3. Sales ⬤⟶54—Contract drawn by buyer must be construed against him.

Contract of sale drawn by buyer, accepted by seller, must be most strongly construed against buyer.

4. Contracts ⬤⟶176(3)—Construction of instrument is one of fact, or mixed question of law and fact, where dependent on collateral facts and inferences.

Although it is province of the court to construe written instruments, yet where such con-

struction depends, not merely on language used, but on collateral facts and the inferences to be drawn therefrom, the question becomes one of fact, or a mixed question of law and fact.

5. Appeal and error ⬤⟶1010(1)—Findings sustained by substantial evidence are conclusive.

Findings of fact, sustained by any substantial evidence, must be accepted by the Circuit Court of Appeals as the final and conclusive determination of the facts.

6. Sales ⬤⟶89—Seller's obligation by subsequent contract to ship and accept certain price held consideration for buyer's agreement to pay such price, where original contract was unenforceable for indefiniteness.

Where original sales contract was unenforceable, because indefinite as to price, the parties dealt at arm's length in the making of subsequent agreements, and seller's obligation by subsequent contract to ship and to receive specified amount per net ton in full payment for coal so shipped constituted sufficient consideration for buyer's promise to pay such amount.

7. Sales ⬤⟶38(5)—Seller's nondisclosure of facts which it was under no fiduciary obligation to disclose did not entitle buyer to avoid contract.

In the absence of misrepresentations between buyer and seller, buyer could not avoid contract for purchase of coal entered into in open, free, and voluntary negotiations, on ground that it would not have entered into contract, had it been advised of facts which seller was under no fiduciary obligation to disclose.

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by the George M. Jones Company against the Canadian National Railway Company and others. Judgment for plaintiff (14 F.[2d] 852), and defendants bring error. Affirmed.

H. R. Martin and L. J. Carrigan, both of Detroit, Mich., for plaintiffs in error.

George D. Welles, of Toledo, Ohio (Tracy, Chapman & Welles, of Toledo, Ohio, Warren, Hill & Hamblin and Charles E. Lewis, all of Detroit, Mich., and Newton A. Tracy, of Toledo, Ohio, on the brief), for defendant in error.

Before DENISON and MOORMAN, Circuit Judges, and HICKENLOOPER, District Judge.

HICKENLOOPER, District Judge. Plaintiff and defendant in error, hereinafter referred to respectively as the railway company and the coal company, entered into a contract on November 25, 1921, for the sale to the railway company of 150,000 tons of run of mine coal from the Hocking district, deliveries to commence April 1, 1922, and to be continued in installments throughout the

then ensuing year ending March 31, 1923. The present controversy arises from the price provision in the contract, that the price should be "the same as paid seller by other railroads on contract for mine run coal from the Hocking district at the time this contract becomes effective." It is conceded that under this provision the parties intended a fixed price for the whole of the customary coal year of railway companies, commencing April 1st and ending March 31st.

Upon April 1, 1922, the coal company had no contracts in force with other railroads, due to a general strike of coal miners. This strike continued until August, 1922, when it was adjusted and the operators recommenced the mining of coal. On August 29, 1922, the purchasing agent of the railway company wired to the coal company: "What are your plans for shipping us coal agreed upon last November, and what are your price views on same?" To this the Jones Company replied: "We are just getting our mines started. Expect to be able to advise you something definite about shipments not later than first of next week, and will see you to discuss price a little later." Pursuant to some further correspondence a representative of the coal company went to Montreal on September 28 and 29, 1922, and there conferred with representatives of the railway company respecting deliveries and price. The results of this conference were embodied in a letter addressed to the coal company, dated September 29, 1922, which provided for the commencement of deliveries and that "it is understood above coal will be billed to us at the rate of $3.50 net ton." The terms of the letter were accepted by the coal company, and the proper decision of the present case depends principally upon the construction to be given the clause quoted.

At the time of this conference, also, the coal company had no contracts with other railroads actually executed or in effect, but negotiations had proceeded with the New York Central Lines to a point where the execution of a contract for the sale of 250,000 tons during the six months from October 1, 1922, to April 1, 1923, at a price of $3 per net ton, was practically assured. No disclosure of these negotiations was made by the coal company, and there is a direct conflict of evidence as to whether the status of contract negotiations with other railroads was the subject of discussion or even mentioned at this conference. On October 2, 1922, however, or immediately following the negotiations and letter of September 29th, the con-

tract with the New York Central Lines was definitely entered into, and shipments of coal to the plaintiff in error railway company were commenced on October 3d and continued in accordance with schedule until the entire amount contracted for had been delivered.

In November and December, 1922, the price of coal materially declined, as is evidenced by a contract between the coal company and the Michigan Central Railroad Company on December 29, 1922, for the sale of 100,000 tons at $2.65 per ton. As early as January, 1923, the coal company proposed a refund to the railway company upon all, or a part, of the coal covered by the contract in suit, provided such contract was renewed for a subsequent period, and according to the terms of such renewal, but no agreement was reached thereon. It was shortly thereafter that the railway company first suggested that it was their representatives' understanding that the price of $3.50, designated as the price at which the coal should be "billed," was not a final price, and proposed a price revision. Up to that time and thereafter throughout the entire period of deliveries all payments which were made were at the rate of $3.50, without question, qualification, or reservation of right to adjustment.

Under the facts as above stated, we find no difficulty in agreeing with the District Judge, to whom the case was tried without a jury, that the parties originally contemplated that the price should be the same as paid the seller by other railroads under contract on April 1, 1922, when deliveries were to commence. Such provisions supplied the yardstick for the measurement of price which saved the contract from invalidity for indefiniteness as of the date of its execution. But no contracts being in force on April 1, 1922, the questions arise whether the original binding character of the contract of November 25, 1921, continued and the provision as to ascertainment of price from contracts with other railroads carried over until some other such contract should be executed; whether the word "billed" should be construed as evidencing such intention of the parties to fix price from the next major contract to be closed; whether contract negotiations with the New York Central Lines were in such shape on September 29, 1922, as then to constitute the criterion for fixing price or to make the nondisclosure of the status of such negotiations a fraud upon the railway company; or whether, entirely apart from the negotiations and letter of September 29,

1922, the original contract first became "effective," within the meaning and intention of the parties, when shipments were commenced on October 3, 1922, at which time the contract with the New York Central Lines had in fact been closed, and such New York Central contract thus afforded the means for then fixing price (as of the effective date) and avoided the lapsing of effect of, or revived, the original contract. Each of these contentions presupposes a continuance of binding obligation on both parties under the original contract of November 25, 1921.

[1] We are of the opinion that, deliveries not having started on April 1, 1922, and the seller having no contracts with other railroads then in effect, the clearly intended method and means for fixing price failed, the provision as to price became ineffective and inoperative, and the contract became unenforceable by reason of the indefiniteness of this controlling element and the necessity for further agreement thereon. National Imp. & Trading Co., Inc., v. Clark, 270 F. 54 (C. C. A. 2); Weston Paper Mfg. Co. v. Downing Box Co., 293 F. 725 (C. C. A. 7); Louisville Soap Co. v. Taylor et al., 279 F. 470 (C. C. A. 6) 27 A. L. R. 119.

[2] In seeming recognition of this uncertainty as to price, an exchange of views upon the subject was proposed by the purchaser immediately upon the possibility of shipment arising. The fact that both parties considered themselves as bound by the contract of November 25, 1921, at least to the extent of being under obligation to agree upon price, does not affect the situation, since both likewise recognized the necessity of price determination. There was no binding and enforceable contract then in existence between the parties. They were negotiating to make definite and certain that which then was indefinite and uncertain. That which had not been agreed upon was made the subject of agreement. The court may not inquire into the secret or unexpressed intention of one or both of the parties. Its sole duty lies in determining the meaning of the language used when considered in the light of the situation of the parties and the purposes and subject-matter of the contract. General Supply Co. v. Marden, etc., Co., 276 F. 786–788 (C. C. A. 3); Ryan v. Ohmer, 244 F. 31–34 (C. C. A. 2); Corbett v. Winston Elkhorn Coal Co., 296 F. 577 (C. C. A. 6). So considered, we are of the opinion that the expressed agreement or understanding that the coal should "be billed" the purchaser at $3.50 per ton was not the fixing of a merely tentative or temporary price, for bookkeeping purposes, but the determination of a final and ultimate price, for the purposes of the contract, which was thus revived and made effective.

This position is emphasized by application of several of the well-known doctrines in aid of construction. The court will ordinarily give that construction to the language used which conforms to the practical construction placed upon the language by the parties themselves. In the present case the railway company continued to treat the price of $3.50 as the sales price, without reservation or qualification, for several months after it must reasonably have been assumed that contracts with other roads had been entered into by the coal company. Invoices were submitted by the seller and paid by the buyer at that price without question that the sale was thereby definitely completed and the obligations of the parties pro tanto discharged. The correspondence of the parties shows no slightest suggestion that the price fixed was but tentative until after the decline of coal prices and the letter of the seller under date of January 16, 1923, offering refund in the event of extension of the contract and the sale of additional tonnage. Even then the suggestions as to price revision by the buyer were offered in the spirit of seeking favor rather than as an assertion of right. It was only when the buyer apparently contemplated the possibility of securing a price reduction in consideration of the payment of its contract indebtedness without litigation, that the present argument was presented. This is a practical interpretation of the contract by the parties while engaged in its performance and presents one of the most satisfactory tests of the true construction to be applied. Uinta Tunnel Min. & Transp. Co. v. Ajax Gold Mining Co., 141 F. 563 (C. C. A. 8); Kentucky Distilleries & Warehouse Co. v. Lillard et al., 160 F. 34 (C. C. A. 6); Nelson et al. v. Ohio Cultivator Co., 188 F. 620 (C. C. A. 6).

[3] Two other doctrines in aid of construction seem pertinent, namely, that the letter of September 29th having been drawn by the buyer, although accepted by the seller, the provisions of such letter must be most strongly construed against the buyer; and, secondly, the doctrine "expressio unius est exclusio alterius." If any ambiguity arises from the use of the word "billed," the court will lean toward that construction most favorable to the seller; and if the price was not intended to be final, it is almost inconceivable that the parties should have omitted express provision as to the time and method of revision. The mere absence of any such express provi-

sion would seem to negative an intention to revise.

[4] If it be conceded that a latent ambiguity arises from the use of the word "billed," when considered in connection with the original contract, the position of the railway company is not improved. Although it is the province of the court to construe written instruments, yet where such construction depends, not merely upon the language used, but upon collateral facts and the inferences to be drawn therefrom, the question becomes one of fact, or a mixed question of law and fact. In Rankin v. Fidelity Trust Co., 189 U. S. 242, 252, 253, 23 S. Ct. 553, 557 (47 L. Ed. 792), the court says: "Although the construction of written instruments is one for the court, where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances, it is one which is properly referred to a jury."

[5] If the question is considered as one of fact, the court is met by the special findings of fact by the District Court that the price provisions of the contract of November 25, 1921, intended the fixation of the price as of April 1, 1922, that this provision became inoperative at that date, that the conference of September 28 and 29, 1922, was arranged for the purpose of discussing price and that the price then agreed upon was intended to be a definite and final price without obligation for revision. These findings of fact, if sustained by any substantial evidence, must be accepted by this court as the final and conclusive determination of the facts in controversy. Corey v. Atlas Coal & Coke Co., 277 F. 138 (C. C. A. 6); Templar Motors Co. v. Bay State Pump Co., 289 F. 24 (C. C. A. 6); Hathaway v. First National Bank of Cambridge, 134 U. S. 494, 10 S. Ct. 608, 33 L. Ed. 1004. Compare Law v. U. S., 266 U. S. 494, 45 S. Ct. 175, 69 L. Ed. 401. In such event we all concur in holding this question of construction not now open to review.

[6,7] The two remaining contentions of railway company may be briefly disposed of. These contentions are that the agreement of September 29, 1922, is a modification of the earlier contract of November 25, 1921, and as such is unsupported by sufficient consideration, and that the nondisclosure of the status of contract negotiations with the New York Central Lines in the conference of September 28th and 29th constituted a fraud upon the plaintiff in error railway company, vitiating any final determination of price. If, as we hold, the original contract became inoperative and unenforceable for indefiniteness on April 1, 1922, the parties must be considered as dealing at arm's length in the making of subsequent agreements and the obligations to ship and to receive $3.50 per net ton in full payment for coal so shipped constituted sufficient consideration for the promise to pay. The evidence discloses no actual misrepresentation and the parties having agreed upon price in open, free and voluntary negotiations for that purpose, the railway company cannot now assert in defense that no such agreement would have been reached had it then been advised of facts which the coal company was under no fiduciary obligation to disclose.

The judgment is affirmed.