DETROIT & SECURITY TRUST CO. v.
FINANCE SERVICE CO. et al.

No. 8369.

District Court, E. D. Michigan, N. D.

Sept. 23, 1930.

600

Miller, Canfield, Paddock & Stone, of Detroit, Mich., for plaintiff.

Duffy & Duffy, of Bay City, Mich., for defendant Bay City Bank.

Max Kahn, of Detroit, Mich., for defendant Commercial Inv. Trust.

TUTTLE, District Judge.

This suit involves the question as to which of two assignees of the same assignor is entitled to priority in the proceeds of the collection of certain accounts receivable, and of certain promissory notes executed in connection therewith, formerly belonging to such assignor. The assignor is Piggott's, Inc., a Michigan corporation, engaged until recently in the retail furniture business in Bay City, Mich., hereinafter called the dealer. One of the assignees is the Commercial Investment Trust, a Massachusetts common-law trust, engaged in the business of financing customers' accounts such as those here involved, hereinafter called the finance company. The other assignee is the Bay City Bank, a Michigan banking corporation, operating a bank in Bay City, Mich., hereinafter called the bank.

This suit, commenced in the circuit court for the county of Bay, Mich., by the Detroit & Security Trust Company, a Michigan corporation, the receiver appointed for the said dealer by the said state court in statutory dissolution proceedings therein, was instituted for the purpose of determining the rights of the various claimants to ownership of the said accounts, and of restraining wrongful interference with such rights. It was duly removed by a nonresident defendant to this court. Thereafter the said finance company, the said bank, and the said Detroit & Security Trust Company as trustee in bankruptcy for the said dealer, which was adjudicated a bankrupt in this court after the commencement of this suit, were joined herein as parties, with their consent and by pleadings and orders which, in substance and effect, made them intervening parties, so that their presence did not destroy nor affect the jurisdiction of this court previously acquired on the ground of diversity of citizenship, notwithstanding the absence of such diversity as between the citizenship of the plaintiff (either as such receiver or as such trustee in bankruptcy) and that of the said bank. Hardenbergh v. Ray, 151 U. S. 112, 14 S. Ct. 305, 38 L. Ed. 93; Porto Rico v. Ramos, 232 U. S. 627, 34 S. Ct. 461, 58 L. Ed. 763; Wichita Railroad & Light Co. v. Public Utilities Commission, 260 U. S. 48, 43 S. Ct. 51, 67 L. Ed. 124. The case has been heard and submitted for final decree on the pleadings and on the proofs taken in open court.

The material facts may be stated, sufficiently for the purposes of this opinion, as follows: Prior to June, 1928, the dealer was engaged in the retail sale of furniture on the credit installment plan. Its regular practice was to sell such furniture to its customers on written, long-term, title-retaining contracts, reserving in it, until payment of the purchase price, the title to the furniture so sold, which, however, was delivered to the purchasers and remained in their possession unless and until retaken on default in payment of such purchase price. After the execution of such a written contract, and often in connection with such execution, the dealer took from the customer, in settlement of the account represented by such contract, a short-term promissory note, bearing interest. Such note contained on its face the following written memorandum: "This note is given in settlement of my account of ———— and in default of payment on same I agree to return all merchandise covered by same, together with payment for damage, use and costs. I agree not to move the goods covered by this account without written permission from Piggott's, Inc. until account is paid in full."

On receipt of such a note the dealer, in many instances, assigned and delivered it to the bank, either as collateral security for a loan to it by the bank, or on a sale of such note to the bank. The bank parted with actual consideration for the notes so received by it and relied, with sufficient reason and in

good faith, upon the right of the dealer to assign such notes to it.

In June, 1928, the dealer borrowed from the finance company $15,000 on its promissory note, and, as security for payment of such note, purported to assign to the finance company customers' written sales contracts, of the kind just described, which on their face appeared to show an unpaid balance due from such customers in the total sum of $22,-500. In connection with almost all of such contracts, the customers by whom they had been signed had already executed and delivered to the dealer their notes in settlement thereof, which notes it had assigned to the bank for value, in accordance with the practice already described. The contracts, however, in settlement of which such notes had been so taken by the dealer and assigned by it to the bank, had not been returned to the customers nor marked as paid, but had been retained by the dealer and were assigned by it to the finance company as "collateral security" for its $15,000 note just mentioned. This note, designated therein as a "collateral note," by its terms recited the assignment of the said contracts; guaranteed that they were "free and clear from all liens" and had "not been transferred or assigned, or given in any way as collateral security or otherwise to any other person"; and authorized the finance company to audit the books and records of the dealer "relating to the collateral for such loan," to "notify the makers of any of the said collateral so placed, of such transfer thereof," and to collect from such makers the amounts due on such collateral. Before accepting such note and collateral and making such loan, the finance company sent a representative to Bay City, who spent several hours in examining certain records and assets of the dealer and in interviewing the manager thereof and his auditor. The records, however, showing the receipts of the said settlement notes were not disclosed or known to such representative and the finance company had no knowledge of such notes. Learning that the dealer owed a substantial amount of indebtedness to the bank, this representative of the finance company interviewed the president of the bank, informed him concerning the contemplated loan on the security of customers' accounts which was under consideration, and inquired relative to the bank's attitude towards the indebtedness owed to it by the dealer. The president expressed the confidence of the bank in the dealer and indicated that, while it did not intend to discontinue the line of credit then existing, it did not desire to increase it and felt that the amount of such indebtedness should be reduced.

The dealer presented to the finance company, with the application for said loan, its financial statement showing, among other things, an indebtedness to the bank, on "customers' notes discounted," in the sum of more than $200,000. On receipt of this statement the finance company, on June 12, 1930, sent to the bank a letter reading as follows:

"The above firm have applied for our accommodations and have submitted their financial statement as of February 29, 1928 for our consideration. It is noted thereon that they have customers' notes discounted with your institution amounting to $215,704.00, and they are also owing to you $44,300.00 on their own paper unsecured. Will you please advise us whether these figures agree with your files as of that date, and at the same time let us know whether they have increased or decreased and by what amount; also if they are obligated to you to-day in any other manner. We will also thank you to favor us with your opinion and experience with them, both morally and financially. Rest assured any information you pass on to us will be held in the strictest confidence and will not reflect upon you, your institution or anybody therewith connected. If we can be of similar service to you, do not hesitate to call upon us, as we will deem it a favor to reciprocate."

To this letter the bank replied on June 15, 1930, as follows:

"Your letter dated June 12th received in regard to Piggott's, Inc., of our city. The concern has been doing business with us for over twenty years and during that time have shown a steady growth. We think that the management has been conservative and they claim losses very small for the amount of business that they are doing. Mr. Piggott, who you might say is the sole owner and manager, is a man of good character and habits and very attentive to business. Our line of indirect has been increased since the statement of about $10,000.00."

Without making any other inquiries of the bank or receiving any other communications from it, the finance company, on June 19, 1928, accepted the said note and made the loan so requested. Neither the bank nor the finance company knew, at that time or until a considerably later period, that the customers' contracts thus assigned by the dealer to the finance company included contracts which had been settled by customers' notes as already described.

After this assignment of these contracts

to it, the finance company not only failed to notify the makers thereof concerning such assignment, but permitted and authorized the dealer to remain as the apparent owner of the said contracts and to receive payment of such of them as had not theretofore been paid. Nor did the bank notify the makers of such notes concerning the assignment thereof to it.

The dealer failed to pay either its indebtedness to the finance company secured by the assignment of contracts to it or its debt to the bank represented by the assignment of customers' notes to it. In November, 1928, the dissolution proceedings already mentioned were instituted and the interested parties learned, for the first time, of the situation thus presented. The conflicting claims arising from this situation they seek to have determined in this suit.

■ The contention of the finance company that it has not been shown that the customers who signed the settlement notes received sufficient consideration therefor, is plainly without merit. These notes, as already appears, clearly recite that they were "given in settlement of" the particular accounts therein mentioned. These and the other provisions contained in such notes, already quoted, relative to the rights of the parties thereto on default therein and regarding possession of the merchandise involved, fairly show the intention and agreement of such parties that said notes should settle and supersede the previously existing sales contracts to which they refer. No evidence has been offered tending to indicate any other intention or agreement between the parties to such notes. I am satisfied by the record, and I find, that the customers' notes in question were intended, and operated, as payment and satisfaction of the contract accounts to which they so referred, and that, consequently, the accounts so paid prior to their purported assignment by the dealer to the finance company were, after such assignment, of no force or effect.

■ Nor does the finance company occupy any better position with respect to the assigned accounts which were paid, by the notes in question, after the assignment of such accounts to it. By broadly authorizing the dealer to continue to collect the balances due on such accounts from its customers, without any restrictions on the medium or method of such payment and without requiring any accounting in connection therewith, the finance company, in substance and effect, constituted the dealer its agent for such collection, with power, as against itself, to receive and dispose of the notes as it thereafter did. Furthermore, under a familiar equitable principle, having made it possible for the dealer to cause this loss, which must fall either upon it or upon the bank, another innocent party, it must itself accept such loss, so made possible by its own act. National Safe Deposit, Savings & Trust Co. v. Hibbs, 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241.

■ It is further urged, in substance, by the finance company that when it informed the bank of its contemplated loan to the dealer on the security of those accounts and inquired of the bank concerning the indebtedness of the dealer, the bank was bound to know that such accounts might have been paid by the customers' notes held by it, and therefore was bound to advise the finance company concerning the provisions in such notes already quoted, so that the finance company might ascertain whether the accounts so offered to it had already been so paid, and it is argued that by reason of its failure to furnish this information the bank is now estopped to claim priority as assignee of such notes. I cannot agree with this contention. Aside from other considerations, the bank bore no fiduciary relation, and owed no fiduciary duty, to the finance company which required it to volunteer such information. Fellows v. National Can Co., 257 F. 970 (C. C. A. 6); Canadian National Railway Co. v. George M. Jones Co., 27 F.(2d) 240 (C. C. A. 6); Jenkins Steamship Co. v. Cargo of Barley (D. C.) 28 F.(2d) 135. Nor is there anything in the record to indicate that the bank supposed, or had reason to suppose, that the dealer would be guilty of the fraudulent conduct practiced by it towards the finance company in connection with these accounts. The evidence satisfactorily shows that the bank truthfully and correctly answered all questions asked of it; that it made no false or misleading statements in this connection; and that it acted fairly and equitably towards the finance company throughout this entire transaction. Moreover, even if it could be properly said that the bank should have suspected that what did happen might happen, and that therefore it should have warned the finance company of that possibility, I discover no reason why the finance company was not equally bound to have the same suspicion and to protect itself, as it could have done as easily as could the bank, by asking for such information as it now claims should have been volunteered. I find in the record no basis for application of the principles of estoppel and no ground for complaint against any of the acts or conduct of the bank.

It is suggested on behalf of the finance company that the contractual provisions contained in the customers' notes in question render such notes nonnegotiable within the meaning under the negotiable instruments law, and some argument is presented to the effect that this affects the rights of the bank as a bona fide holder thereof. It is undoubtedly true that the presence in these notes of the recitals and covenants already quoted destroyed their character as so-called negotiable instruments, within the scope of the rules relating to negotiable paper, as does not seem to be seriously denied by the bank. This, however, does not affect the situation. The rights of the bank in this connection do not arise from, nor depend upon, the negotiability of these notes as strictly negotiable instruments, but upon their assignability and assignment, as choses in action, to it, under the circumstances described, which entitle it, as such assignee thereof, to the priority claimed.

Among the accounts assigned to the finance company and here involved were several, aggregating the sum of approximately $1,300, as to which no settlement notes had been received by the dealer and assigned to the bank. The claimed right of the finance company to these accounts does not appear to be disputed, and must be sustained. The bank claims, however, to be entitled to reasonable compensation for its services in making collection of certain of the said accounts. Such services, however, do not appear to have been rendered under any contract with the finance company, express or implied, or at its request, and no legal basis for the allowance of compensation therefor has been shown.

I reach the conclusion that, with the exception just noted, the defendant Bay City Bank is entitled to the priority claimed, and the relief prayed, by it, as against the defendant Commercial Investment Trust, and a decree may be presented in accordance with the terms of this opinion.