**ALLIS-CHALMERS MANUFACTURING COMPANY, a Delaware corporation, Plaintiff,**

v.

**CONTINENTAL AVIATION AND ENGINEERING CORPORATION, a Virginia corporation, and George D. Wolff, Defendants.**

Civ. No. 27858.

United States District Court
E. D. Michigan, S. D.

Feb. 17, 1966.

Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for plaintiff.

Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

KAESS, District Judge.

This is an action to enjoin disclosure and use of trade secrets. On the basis of the complaint and affidavits attached thereto, from which it appeared that immediate and irreparable injury would result to plaintiff without such an order, this court on December 30, 1965 issued a temporary restraining order, enjoining defendant Wolff from disclosing plaintiff's trade secrets relating to fuel injection systems, from violating his employment contract or fiduciary duty to plaintiff, and from engaging in any work for defendant Continental Aviation and Engineering Corporation in connection with the design, development or manufacture of fuel injection pumps, or which might require or permit the disclosure of plaintiff's trade secrets, and enjoining defendant Continental Aviation and Engineering Corporation from obtaining and acquiring from Wolff any of plaintiff's trade secrets or confidential information relating to fuel injection systems, from employing Wolff in any capacity which calls for or requires the disclosure by him of any of plaintiff's trade secrets relating to fuel injection systems, from assigning or allowing Wolff to perform any work in connection with the design and development of fuel injection pumps. Both defendants were ordered to appear and show cause why a preliminary injunction should not issue, enjoining them from engaging in or causing any of the above acts or omissions, pending the final hearing and determination of this action.

At the hearing on plaintiff's motion the following facts were established. Plaintiff, the Allis-Chalmers Manufacturing Company,[1] is a Delaware corporation with its principal offices and place of business in West Allis, Wisconsin. It is engaged in the business of developing, manufacturing and marketing a large variety of products, including engines, earth-moving equipment, electrical equipment, turbines, and farm equipment. The Engine-Material Handling Division has a plant at Harvey, Illinois, where internal combustion engines, including diesel engines, are designed and manufactured. At this plant, under the

---

1. Hereafter referred to simply as "Allis-Chalmers".

immediate direction of Dr. Alexander Dreisin, Allis-Chalmers is presently developing distributor type fuel injection pumps for use on its own diesel engines and for use on engines manufactured by other users. The engineering department at the Harvey plant includes a fuel systems laboratory where fuel injection equipment, including that of Allis-Chalmers design, is tested.

Defendant Continental Aviation and Engineering Corporation[2] is a Virginia corporation with its principal place of business in Detroit, Michigan. It is primarily engaged in the design and manufacture of engines and some components thereof. Its current production of fuel injection engines is almost entirely for military use. In its production of injection engines Continental is essentially a broker or assembler, purchasing from vendors all parts except the block, crankshaft and rods. The present commercial production of diesel engines by Continental and its parent, Continental Motors Corporation, is slight. Continental is engaged, however, in producing a diesel engine (the "465") for military trucks which it hopes to adapt for commercial use and projects sales in the next four years of 10,000 per year. It also produces for the armed forces a multi-fuel version of the "465" engine, and is engaged in the performance of a government contract for the development of a diesel battle tank engine of 1,475 horsepower. In November, 1965, Continental received a government contract for the development of a hydraulic type fuel injection pump. This contract by its terms would apparently cover a distributor type pump, as it is likewise hydraulic. However, the contract is based upon a proposal submitted by Continental in 1965, which envisions a pump of a different nature than the distributor type manufactured by Allis-Chalmers.

Defendant George D. Wolff, a mechanical engineer, is presently a resident of St. Clair Shores, Michigan, having come here in December, 1965 to work for Continental in the area of fuel injection systems. Immediately prior to moving to Michigan he was a resident of Illinois, employed by Allis-Chalmers at its Harvey, Illinois, fuel injection laboratory. He was in charge of the laboratory where fuel injection pump components and assemblies were tested. Born in Estonia and raised in Germany, Mr. Wolff obtained considerable experience in the field of engine development and application. He came to America in 1956 to work as an application engineer on fuel injection equipment in the American subsidiary of a German corporation. In August, 1961, Wolff became employed by Allis-Chalmers. Prior to this time he had no specific experience in the design and development of the distributor type pump here involved, transferring to Allis-Chalmers because of the opportunity to do research and development rather than application engineering.

Diesel engines employ fuel injection systems for the introduction of the diesel fuel into the engine cylinders in the form of finely atomized droplets that are ignited by the heat of the air compressed by the piston. The fuel injection system consists essentially of a pump, driven by gears off the motor crankshaft, that pushes fuel under very high pressure into injection lines leading to the engine cylinders, at which point the fuel passes through an atomizing nozzle.

The technical part of this dispute concerns fuel injection systems for diesel engines used on mobile equipment such as trucks, buses, military tanks and tractors. There are certain fuel injection systems which are made by engine manufacturers for their own particular, or proprietary engines.[3] For the non-proprietary or "non-captive" market, there are two other fuel injection systems for mobile diesel engines, which comprise the majority of the systems which are used in that market. These are the in-line pump and the distributor type pump.

---

2. Hereafter referred to simply as "Continental".

3. E. g., General Motors Corporation, Caterpillar Tractor Company, and Cummins Engine Company.

The in-line pump has been used for nearly forty years and is manufactured by at least twenty different companies all over the world. This system employs a separate pump assembly for each cylinder of the engine.

In the distributor type pump a single pump assembly delivers fuel to a number of engine cylinders, thereby reducing the cost and size, and simplifying the device. This type of pump has been increasingly used on engines for mobile applications and is predominant in high-speed diesel engines in mobile equipment. Distributor type pumps combine several different functions into a compact arrangement of fewer parts than the in-line type, and are much more difficult to design and manufacture. There are only three companies which market distributor type fuel injection pumps at the present time. These are Standard Screw Corporation, which markets the "Roosa-Master" pump, American Bosch Company, and Robert Bosch of Germany. At least eight American and foreign companies have attempted and so far failed to produce and market a distributor type pump successfully [4]

In addition to the limited number of commercial manufacturers of such pumps, the difficulty in designing and building such a pump is also attested to by the length of time necessary to successfully produce one. The Roosa-Master pump, for example, was first conceived about 1938, a prototype was put on an engine in 1942, and the pump finally went into limited production in 1950. The Roosa-Master pump today only operates for engines with a rated capacity of up to 200 or 250 horsepower. The American Bosch pump has been marketed for some 15 years. The "reach" or "turn down ratio" is the ratio between maximum and minimum fuel delivery of the fuel injection pump. The maximum fuel delivery is that quantity of fuel delivered by the pump at maximum engine output and minimum fuel delivery is that quantity of fuel delivered by the pump

during low speed idling of the engine without load. The American Bosch pump on the market today experiences difficulties in increasing its reach and also has a problem of excessive fuel consumption when greater reach is demanded. The Robert Bosch pump is a late arrival and is used only for engines up to 100 horsepower. Robert Bosch's complications in developing this pump included obtaining a license from American Bosch, having it produced in Japan, and finally purchasing a French company to get the hydraulic portion of the pump.

Even on present engines, fuel injection systems are hard to tailor to the engine and hard to maintain. Development of diesel engine design generally is being inhibited by the need for fuel injection systems to be developed for such engines. Turbo-charging, a method of getting more horsepower out of a diesel engine, which is increasingly popular, places a greater demand on the reach of the fuel injection pump or system. The battle tank engine now under development at Continental is an example of a new engine which will require greater reach with its concomitant demands on the fuel injection pump.

In 1942 development of a distributor type fuel injection pump was commenced at a division of the Micromatic Hone Company. Dr. Alexander Dreisin joined Micromatic Hone in 1950 and evaluated this pump. It was his conclusion that this pump design should be scrapped and work on a new pump commenced. The first sketches of this pump were made in about 1952 and in 1953 a prototype of this pump was running on a two cylinder engine for the D. W. Onan Company of Minneapolis, a customer of Micromatic Hone. It was not until 1958, however, that this pump was able to be produced for commercial marketing.

The assets of this Micromatic Hone division were purchased by Allis-Chalmers in 1958. The type of pump being

---

4. International Harvester; Timken Bearing Company; Ex-Cell-O Corporation; Bendix Scintilla, Division of Bendix Corporation; C. A. V. Ltd. of England; Simms Motor Units Ltd. of England; Fiat of Italy; and Kugglefischer of Germany.

sold to Onan Company had to be redesigned for the larger demands of Allis-Chalmers' own engines. The development of a larger distributor type fuel injection pump continued to be one of the major projects of the advanced design group and fuel systems laboratory at Allis-Chalmers.

Major design changes were undertaken by Allis-Chalmers and details of some of the parts of the pump were changed. Development of the pump culminated in prototype models which were both "bench" and engine tested by Allis-Chalmers. These prototypes carried the designation "Model B". This was a pump for use on diesel engines only. It was given further field tests on Allis-Chalmers engines and in Allis-Chalmers vehicles to determine its endurance and reliability. As of January 1, 1965, the Model B was ready for production.

The Model B pump incorporates several advantages over other distributor type fuel injection pumps currently available: projected cost of production; more efficient use of parts; better timing of injection in a less complex manner; more efficient use of gears and savings on parts; more efficient use of parts in the governor mechanism; larger reach than anything that could be obtained from commercially available pumps; better behavior on cavitation erosion tests; and more compact design because it is driven at engine speed.

Some time in the spring of 1964 Allis-Chalmers learned that the United States Army was interested in securing a "second source" for a fuel injection pump to be used on its truck and tank engines. At that time Continental was under contract with the Army for the design, development and production of these engines and the American Bosch Company was the only source of supply for the distributor type, engine speed, fuel injection pump which was being used on these engines. On July 2, 1964 Dr. Dreisen, along with other personnel of Allis-Chalmers, came to Detroit to interest the Army in its prototype of the Model B pump. In a meeting with Army personnel the Allis-Chalmers people were told that Continental had been designated as the only approved design agency of the Army and it would be necessary, in order to interest the Army in the pump, to have Continental test and approve the pump for use. On that same day Dr. Dreisen met with representatives of Continental's engineering department and described generally to them the then state of developments and design of the Model B pump. Continental indicated an interest in the pump and its possibilities, and after further correspondence on the matter, Allis-Chalmers delivered a Model B prototype to Continental, for bench and engine testing.[5] These were favorable to the extent that Continental wanted further discussions regarding the pump. Several meetings were held between Allis-Chalmers and Continental personnel, at which Continental indicated interest in whether the Allis-Chalmers pump might be adapted or modified to operate on multi-fuel engines for military trucks. Further discussions were held, drawings were submitted to Continental by Allis-Chalmers,[6] Army approval was obtained, and on March 30, 1965 Continental issued a purchase order calling for three fuel injection pumps to be modified for multi-fuel operation. This is the presently existing prototype pump designated "Model C", which in-

5. Allis-Chalmers expressly requested that one of its engineers be present at these tests. The bench test was conducted in the presence of an Allis-Chalmers engineer. An engine was not available at that time for the proposed engine test, and this test was conducted at a later time without the presence of an Allis-Chalmers engineer. However, the test results were reported in detail to Allis-Chalmers by Continental.

6. EX 26298, an assembly drawing of the Model B, and an overlay drawing, EX 27119, show how the Model B could be modified for use on multi-fuel engines. Imprinted on the paper upon which these drawings were made were the words "Confidential—Property of Allis-Chalmers".

corporates essentially the same unique features of the Model B, but has been redesigned to operate on gasoline as well as diesel fuel and to operate on engines up to 400 horsepower.

After some dickering as to the language of the purchase order, it was agreed that Allis-Chalmers would accept it.[7] Further discussions continued throughout 1965, relating to the progress of this pump, a possible license from Allis-Chalmers to Continental to build pumps of Allis-Chalmers design, the possibility of adapting an Allis-Chalmers pump to operate on the 12-cyclinder 1475 horsepower battle tank engine, for which Continental had obtained a development contract, and a possible license from Continental to Allis-Chalmers of Continental's patent rights on a variable compression ratio engine. A proposed agreement for the licensing of patent rights and "know-how" from Allis-Chalmers to Continental for the building of the pump for the battle tank engine was prepared by Allis-Chalmers and rejected by Continental.

Development of the Model C pump has continued and is continuing now at Allis-Chalmers. This pump is presently in the prototype stage and is ready for actual testing by Allis-Chalmers.

Allis-Chalmers has taken the usual and reasonable precautions at its Harvey plant to preserve and protect the confidential nature of its development of a distributor type fuel injection pump. The plant is fenced and guarded and visitors are restricted. Passes must be issued to authorized personnel and all visitors must have passes and be accompanied by an Allis-Chalmers employee while in the Harvey plant. Before entering the fuel systems laboratory, which is within the engineering department, a special pass is required that can only be issued by one of four people. Files containing drawings and copies of patent applications are locked and all engineering drawings are labeled "Confidential— Property of Allis-Chalmers", except for those drawings which are for general distribution. Mr. Wolff was aware of the confidential nature of the work of the group to which he was assigned and abided by all restrictions.

While at Allis-Chalmers, defendant Wolff had access to and became familiar with all of Allis-Chalmers' past research, design development and refinements, and development and manufacturing "know-how" relating to fuel injection systems in general and distributor type fuel injection pumps in particular. In his position as head of the fuel systems laboratory, he was responsible for all functional research and testing, and thus became intimately connected with the development of the Allis-Chalmers distributor type fuel injection pump. He also made drawings from which further work was done in building the various parts, recommended certain tolerances, clearances and fits to members of the design group, and recommended certain design changes for optimum operation of the distributor type pump. He was the inventor listed on five patent applications relating to design improvements and development of the pump. Each of these inventions is the property of Allis-Chalmers and has been assigned to Allis-Chalmers by Mr. Wolff.

In early 1965 the engineering department at Continental required a variety of additional personnel, particularly an engineer with broad experience in engine development in general, plus experience in the fuel injection field, to relieve the project engineers on Continental's various engine projects of the responsibility for the fuel injection systems as to such engines and to coordinate this responsibility in one person.[8] Forty applicants

---

7. After Allis-Chalmers objected to that portion of the purchase order calling for the granting of rights in connection with development or research done under the order to Continental and the Government, it was deleted.

8. On January 11, 1965 Mr. Walter Isley of this department initiated a personnel request, salary $1,000–$1,400 per month, needed "now". From January to October, 1965, advertisements for someone to fill this position were run.

for positions in Continental's engineering department were interviewed by Mr. Isley, but he found no one for this particular job.

Coincidentally, during the spring of 1965, Mr. Wolff, in evaluating his position at Allis-Chalmers, concluded that perhaps he was at a dead end there because of the small size of the group in which he worked, his junior position in it, and Dr. Driesin's competence at its head. He began looking around for a position where there would be opportunity for advancement in respect to both responsibility and salary.[9] Through a fellow employee who was leaving Allis-Chalmers and had interviewed Continental, he learned of the position available at Continental. On June 1, 1965, Mr. Wolff wrote to Mr. Isley applying for the Continental job, sending his résumé and letters of recommendation. An interview with Mr. Isley was arranged by a personnel representative of Continental. During this interview, while one or two specific references to the Allis-Chalmers pump may have been made, the conversation was essentially general in nature, relating to Mr. Wolff's background, experience and expected salary. He was given a tour of Continental's plant in Detroit and shown one or two drawings. Mr. Isley was impressed with Mr. Wolff and after discussing him with the head of Continental's engineering department, offered him the job at $1,400.00 per month. Mr. Wolff refused the position for various reasons, including salary and fringe benefits. The salary offer was raised to $1,500.00, but

Mr. Wolff again rejected it, suggesting a further interview. Such an interview was held on October 16, 1965, in Detroit, with Mr. Isley and C. F. Bachle, Vice President-Research of Continental. Again some aspects of the Allis-Chalmers pump were mentioned, but Mr. Wolff declined to go into any details which might involve proprietary information of Allis-Chalmers. Mr. Bachle discussed Continental's position relating to fuel injection systems,[10] and explained the opportunity available in that field at Continental. On October 24, 1965, Mr. Wolff accepted the position. He terminated his employment at Allis-Chalmers on December 15, 1965 and was to begin work at Continental on January 3, 1966.

There is confusing and conflicting testimony as to what Mr. Wolff was told regarding his proposed duties at Continental and what he understood them to be.[11] However, it is clear from the evidence adduced at the hearing that Wolff's immediate duty at Continental is to work on the fuel injection system for the proposed battle tank engine, which would involve perfecting the design of a Continental developed in-line pump and working with the American Bosch Company on its experimental distributor type pump that Continental is testing.[12] This latter would involve doing testing and application engineering and serving as "technical contact man" with American Bosch personnel, including of course the making of recommendations for design and manufacturing changes and improvements. As the tank work lessens,

9. Wolff contacted a German company as to heading up their proposed United States operations, answered a questionnaire, and sent his letters of recommendation to an employment agency, and interviewed Bendix Scintilla Div. of Bendix Aviation Corp.

10. He stated that Continental had gone as far as possible with a "trial and error approach" and needed a more "scientific approach and that the present Continental fuel systems had reached the limit on extending the "fuel range".

11. Aside from differences in Mr. Wolff's own testimony at the hearing from that given in his deposition, there is considerable conflict between the testimony of Mr. Isley and his superior, Mr. Blackburne, at the hearing, and the testimony of C. F. Bachle, Mr. Blackburne's superior, at his deposition.

12. This American Bosch experimental pump largely involves the "siamesing" or "twinning" of two small distributor type pumps designed for smaller engines, of the nature of those now on the market. Similarly, two small Allis-Chalmers pumps could be "siamesed" to obtain the same results.

Mr. Wolff is to become coordinator and technical specialist for the fuel injection systems required by Continental's various projects, providing technical and economic evaluation of the various systems, recommending development work, recommending construction of facilities and methods of testing, and recommending design changes where necessary.

It is undisputed that there are five patent applications pending for inventions relating to Allis-Chalmers fuel injection pump development. These relate to a concept called "precharging", fuel pump venting, precharging with pilot injection, and two further refinements on fuel injection systems. These applications list Mr. Wolff as inventor and relate to inventions made by Wolff while he was employed at Allis-Chalmers. They have been assigned to Allis-Chalmers and are its property. There does not appear to be any dispute that these applications and the concepts contained therein should be regarded as trade secrets.[13]

There also exists a body of information concerning these pumps and their design which is not the subject of patent applications, has not been disclosed to the public, has been reduced to concrete form and documents, and would be useful in designing a distributor type fuel injection pump of the performance capabilities of the Allis-Chalmers Models B and C. This is detailed and technical information relating, for example, to optimum finishes on surfaces of parts, certain heat treatments, certain spill port configurations and sizes as being critical on certain applications, and certain critical tolerances and fits for pump parts. Mr. Wolff learned about such areas of information while employed by Allis-Chalmers. All of this information would be of value to Allis-Chalmers' competitors in the saving of time and money and material.

There was generally described a process of manufacturing for a particular part of this pump which solved a problem that was "practically insolvable", which solution could not be determined from an examination of the pump and which has not been disclosed. There have been choices of materials in these pumps which, while such materials are known in industry generally, are not known as applicable to fuel injection pumps. Other unique and useful features were developed in the Allis-Chalmers pump relating to fuel distribution and design of the governor mechanism and the method of lubrication in the pump.

The competitive advantage in knowing precisely what materials and heat treatments are used is illustrated by Plaintiff's Exhibit 21—a cam follower. Although a competitive pump had a similar part, an examination of it did not permit successful development of such a part on the Allis-Chalmers pump. Almost a year and a half of testing the choice of materials, selection of heat treatment, tolerances, and method of lubrication was needed to arrive at a satisfactory cam follower.

In developing the pump, some $50,000.-00 was spent on "blind alley" or "negative test result" research on one particular problem and some $30,000.00 on another such research project. Particular designs were developed for both the Models B and C which represent distinct advantages over other pumps currently available. The confidential, proprietary information relating to the Allis-Chalmers pump represents competitive advantages over competitive pumps, and such advantages would remain in an Allis-Chalmers pump as modified for use on the battle tank engine.

█ Involved in the present proceeding are two apparently conflicting principles of law. On one extreme lies the principle that an individual has the right

---

13. Mr. Wolff had in his possession at the commencement of this action copies of several of these patent applications. He returned them immediately after being advised that the suit had been instituted.

He testified that they were packed away and that he had been asked to return them, but thought that "no particular hurry" was necessary.

to change his employment for whatever reason he wishes and the right to utilize his general skill, knowledge and experience for the benefit of his employer.[14] Indeed it is inevitable that some of the knowledge acquired while in the former employment should be made available to the new employer, and courts will not deprive the employee of the right to use the skill he developed through the years. Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Cal.1958), aff'd 283 F.2d 695 (9th Cir. 1960); May v. Mulligan, 36 F.Supp. 596 (W.D. Mich.1939) affirmed 117 F.2d 259 (6th Cir.) cert. denied 312 U.S. 691, 61 S.Ct. 622, 85 L.Ed. 1127 (1940).

■ At the other end of the spectrum is the law of unfair competition, including trade secrets law, in which the courts seek to enforce increasingly high standards of fairness or commercial morality and to protect the owner of information obtained through the ingenuity and effort of its employees, and its expenditures of time and money. Franke et al. tures of time and money. Franke v. Wiltschek, 209 F.2d 493 (2nd Cir. 1953); Schulenburg v. Signatrol, Inc., 200 N.E. 2d 615, 142 USPQ 510 (Ill.App.1964).

■ There is some conflict of authority as to what constitutes a legally protectible trade secret, with some courts holding that it must consist of a particular form of construction of a device, a formula, a specific method or process that is unknown to others in the trade, etcetera, and must amount to discovery. Sarkes Tarzian, Inc. v. Audio Devices, Inc., supra. However, the weight of modern authority, including Michigan, holds that a trade secret may consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it. Hulsenbusch v. Davidson Rubber Co., Inc., 344 F.2d 730 (8th Cir. 1965); E. I. duPont de Nemours & Co. v. American Potash Corp., 200 A.2d 428, (Del Chancery 1964); B. F. Goodrich Co. v. Wohlgemuth, 192 N.E.2d 99 (Ohio App.1963); 4 Restatement, Torts, § 757 (1939). It may be a device which is patentable, but it need not be. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement. Vitro Corp. of America v. Hall Chemical Co., 254 F.2d 787 (6th Cir. 1958); A. O. Smith Corp. v. Petroleum Works Co., 73 F.2d 531 (6th Cir. 1934); Head Ski Co. v. Kam Ski Co., 158 F.Supp. 919 (D.Md. 1958); Manos v. Melton, 358 Mich. 500 (1960); 4 Restatement, Torts, supra. This is because, unlike the patent monopoly, trade secret protection is not a reward to the inventor, but merely a protection against breach of faith and reprehensible means of learning another's secret. See, 4 Restatement, Torts, supra. The subject matter of a trade secret must be secret. Matters of public knowledge or general knowledge in the industry, or ideas which are well known or easily ascertainable, cannot be trade secrets. Similarly, matters disclosed by a marketed product cannot be secret. However, the proprietor of the business may communicate the secret to employees involved in its use, or to others pledged to secrecy. 4 Restatement, Torts, supra. A disclosure made to one in a confidential relationship, such as a vendee-vendor, relating to the item under negotiation does not cause secret information to lose its protectible character. Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347 (9th Cir. 1963); Schreyer v. Casco Products Corp., 190 F.2d 921 (2nd Cir. 1951).

14. A Michigan statute, C.L. '48 § 445.761; Mich.Stat.Ann. § 28.61,. declares void and unenforceable all agreements not to engage in any vocation, employment, trade, profession or business, whether they are reasonable or unreasonable, partial or general, limited or unlimited. However, in Glucol Manufacturing Co. v. Schulist, 239 Mich. 70, 214 N.W. 152 (1927); the Michigan Supreme Court held that this statute had no application to cases involving trade secrets.

A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue. Truly v. Wanzer, 46 U.S. (5 How.) 141, 12 L.Ed. 88 (1847); Harris v. Twentieth Century Fox Film Corp., 35 F.Supp. 153 (S.D.N.Y.1940); Township of Romulus v. City of Detroit, 366 Mich. 671, 115 N.W.2d 571 (1962); Dutch Cookie Machine Co. v. Vande Vrede, 289 Mich. 272, 286 N.W. 612 (1939).

However, it is well settled that an injunction may issue against unauthorized disclosure and use of trade secrets before such use or disclosure occurs. Fairchild Engine and Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643 (1944); 2 Restatement (2d) Agency § 399 (1958). The facts may warrant a conclusion of a threat of disclosure or wrongful use of plaintiff's trade secrets without an enumeration of the specific secrets, at least at this preliminary state of the proceedings. See, E. I. duPont de Nemours & Co. v. American Potash Corp., 200 A.2d 428 (Del Chancery 1964). It is also recognized that satisfactory protection of a trade secret may require a prohibition of work for a competitor along lines involving use of the secret for a reasonable period. Ellis, Trade Secrets § 87 (1953); Eastman Kodak Co. v. Powers Film Products, 189 App.Div. 556, 179 N.Y.S. 325 (1919).

Application of the foregoing principles of law to the facts established at the hearing results in the following conclusions.

The requisite diversity of citizenship of the parties and amount in controversy for jurisdiction in this court are present.

Allis-Chalmers possesses confidential, proprietary information relating to development, design and manufacture of distributor type fuel injection pumps, which constitute trade secrets and are protectible as such. These trade secrets have not been disclosed to the public and have been retained in confidence by Allis-Chalmers. Any disclosures which may have been made to Continental were made under circumstances which give rise to a relationship of trust and confidence between Allis-Chalmers and Continental, so that this information retains its nature and value as a trade secret.

The course of negotiations, relating to distributor type fuel injection pumps, between Allis-Chalmers and Continental, the nature of the research and development work done by Mr. Wolff on distributor type fueling pumps at Allis-Chalmers, the nature of the type of work Mr. Wolff is to perform at Continental, which includes design and development of distributor type fuel injection pumps, all lead to an inference that there is an inevitable and imminent danger of disclosure of Allis-Chalmers trade secrets to Continental and use of these trade secrets by Continental.

The virtual impossibility of Mr. Wolff performing all of his prospective duties for Continental to the best of his ability, without in effect giving it the benefit of Allis-Chalmer's confidential information, makes a simple injunction against disclosure and use of this information inadequate.

This court has attempted to formulate an order which will strike a proper balance between the public policy of Michigan, as declared in Mich.Stat.Ann. 28.61 of protecting and encouraging the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another, and the rights of an employer to its accumulated body of trade secrets obtained by the expenditure of great amounts of time and money.

Thus, the injunction granted is as restricted as possible to protect the secrets involved without undue restraint on Mr. Wolff's right to pursue his chosen vocation, only prohibiting work in the design and development of distributor type pumps. Mr. Wolff is able to work at Continental in application engineering without limitation as to the field of activity, and to engage in design and development in all kinds of fuel injection systems and pumps except a distributor

type pump. Furthermore, the injunction granted is limited in time. Being a preliminary injunction it will last in any event only until final hearing in the action, and it may terminate earlier by its own terms, if the confidential information comes into the possession of Continental by legitimate means.

An order has been entered in conformity with these findings.