IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 20, 2002 Session

## EAGLE VISION, INC. v. ODYSSEY MEDICAL, INC., ET AL.

**A Direct Appeal from the Chancery Court for Shelby County**
**No. 110118-3      The Honorable D. J. Alissandratos, Chancellor**

---

**No. W2001-01772-COA-R3-CV - Filed August 14, 2002**

---

This is an action for misappropriation of trade secrets in which the manufacturer of a surgical product allegedly misappropriated the product design and marketed a competing product after the developer discontinued its relationship with manufacturer. Trial court granted summary judgment in favor of manufacturer on all claims. We reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and WILLIAM B. ACREE, JR., SP.J., joined.

Robert E. Craddock, Jr.; John S. Wilson, III, Memphis, For Appellant, Eagle Vision, Inc.

Randall D. Noel; Daniel W. Van Horn, Memphis, for Appellees, Odyssey Medical, Inc., and Gary Tatge

## OPINION

This action for misappropriation of trade secrets, breach of contract, breach of fiduciary duty, and conversion arises out of the manufacture of a surgical product. Plaintiff/Appellant Eagle Vision, Inc. ("Eagle Vision") develops and markets products for opthamalogic surgery.[1] In 1995, Curtis Freeman, president of Eagle Vision, approached Gary Tatge, president of Odyssey Medical, Inc. ("Odyssey"), about the possibility of Odyssey manufacturing a device called a "punctum plug"[2] for Eagle Vision ("Plug").

---

[1]Eagle Vision uses third parties to manufacture its products.

[2]A "punctum" is the tiny opening in the corner of the eye which drains tears from the eyes to the sinuses. A "punctum plug" is used in the treatment of "dry-eye syndrome."

The record indicates that, at the initial meeting between Freeman and Tatge, the parties discussed confidentiality agreements, but that Mr. Freeman was the only one who signed such an agreement, apparently leaving open the possibility of Mr. Tatge signing a similar agreement at a later date. There were no other discussions regarding confidentiality agreements between the parties until after the parties had been working together for several years.

In order to facilitate the manufacture of the Plug, Eagle Vision provided Odyssey with detailed drawings and information regarding the Plug's design, as well as a sample plug. From the sample plug, Odyssey made measurements which it then compared to the drawings, and manufactured the device. Based upon their inspection of the device Odyssey had manufactured, Eagle Vision and Odyssey entered into a "fee-for-services" vendor arrangement, and signed a Letter of Understanding on August 23, 1995. Neither these documents, nor any other documents setting out the relationship between the parties, contains a confidentiality clause or non-compete provision in favor of Eagle Vision, or words such as "confidential" or "trade secret." However, Eagle Vision's design specifications drawings, which Odyssey used to enter data into its Computer Assisted Design ("CAD") software, were clearly marked, "Confidential."

As part of its relationship with Eagle Vision, Odyssey provided regulatory consulting services to Eagle Vision, which gave Odyssey access to Eagle Vision's FDA files, including patient complaint information. The record indicates that Odyssey was aware of Eagle Vision's desire that the relationship between the parties and the information communicated between them be kept confidential. In this regard, the record establishes that Odyssey required its employees to execute a confidentiality agreement which provided that the Odyssey employee must protect confidential information, "regardless if the information is the direct property of Odyssey or is protected under a separate agreement with a third party."[3] The record also contains evidence to the effect that Mr. Tatge made notations to, "Keep all Eagle Confidential," and "lock everything up." When asked in deposition whether Mr. Tatge communicated the need to "keep all Eagle confidential," Odyssey employee Ray Wallace testified that, "Our desire at this point in time was to maintain good separation between Eagle Vision and anything else we were doing."

After Odyssey had manufactured the Plug for Eagle Vision for several years, the parties had a parting of the ways over a price increase Odyssey requested. In addition to rejecting Odyssey's request for the increase in price to Eagle Vision, Eagle Vision asked Odyssey to execute a non-compete agreement, which Odyssey refused to sign. After the parties failed to reach an agreement, Odyssey claims it began to develop its own punctum plug, which it began marketing in 1997.

On October 24, 1997, Eagle Vision filed a Complaint against Odyssey and Tatge for breach of contract, misappropriation of trade secrets, breach of implied duty of confidentiality, breach of

---

[3]That confidentiality agreement provides that "confidential information" includes: business records and plans; financial statements; customer lists and records, trade secrets; technical information; products; inventions; product design information; pricing structure, discounts; costs; computer programs and listings; copyrights and other intellectual property; mold fixture construction techniques; Odyssey molding techniques, and other proprietary information.

fiduciary duty, and conversion. Odyssey and Tatge filed separate answers, and Odyssey filed a counterclaim for an unpaid balance on Eagle Vision's account. On January 11, 2000, Odyssey filed a motion for partial summary judgment on Eagle Vision's misappropriation of trade secrets claims (specifically, the plug's dimensions and material specifications). On May 5, 2000, the trial court granted partial summary judgment on those issues in favor of Odyssey. The trial court's order reads, in relevant part:

> It appearing to the Court that upon Defendants' Motion for Partial Summary Judgment and supporting Memorandum; upon the Response of the plaintiff thereto; upon defendants' Reply Memorandum; upon all of the respective exhibits and statements of undisputed fact filed by the parties; upon the depositions filed herein; upon the oral argument of counsel occurring in open Court on April 12, 2000; upon the Court's own research of the relevant case law; and upon the entire record herein, the motion of Odyssey Medical, Inc. and Gary Tatge for Partial Summary Judgment is well taken and should be granted. . .
>
> IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that ***the dimensions of the marketed Eagle Vision punctum plugs, as well as the use, selection and grade of silicone comprising the plug material, and the use, selection and percentage of titanium dioxide as the plug tint agent are not trade secrets. . . .***

(emphasis added).

On June 6, 2000, Odyssey filed a second motion for summary judgment on the counterclaim for the unpaid balance, which the trial court granted in favor of Odyssey on August 1, 2000, placing the funds in escrow pending the resolution of the case. And, finally, on November 6, 2000, Odyssey filed its third motion for summary judgment on Eagle Vision's remaining claims. In response to this motion, Eagle Vision waived or abandoned all the claims with the exception of the misappropriation of trade secrets claims as to tolerance data, breach of contract, and breach of fiduciary duty. On April 2, 2001, Eagle Vision filed a motion to reconsider Odyssey's first motion for summary judgment, which the trial court ultimately denied on July 9, 2001.

On May 21, 2001, the trial court granted summary judgment on all remaining claims. Eagle Vision appeals this final order, and presents the following issues for review: (1) Whether disputed evidence of Defendants' ability to reverse-engineer Plaintiff's product raises genuine issues of material fact that preclude summary judgment; (2) Whether the hypothetical ability to reverse-engineer a products excuses the misappropriation of confidential information; and (3) Whether a vendor's wrongful retention of a vendee's property creates a right of set-off against unpaid invoices submitted by the vendor.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

We will consider the first and second issues together. The elements in an action for misappropriation of trade secrets are set out in *Hickory Specialties, Inc. v. B&L Laboratories, Inc.*, 592 S.W.2d 583 (Tenn. Ct. App. 1979), where the Court said:

> The elements required in an injunctive trade secrets suit are set for th in *Smith v. Dravo Crop.,* [203 F.2d 369 (7th Cir. 1953)], as the existence of a trade secret which is communicated to the defendant while the defendant is in a position of trust and confidence and use of that information by the defendant to plaintiff's detriment. The fact that the secret could have been discovered by the defendant, through his own skills and initiative, is not determinative. The issue is whether the information was actually procured through a confidential relationship.

*Id.* at 586.

In considering these issues, the seminal question is whether the specifications of Eagle Vision's punctum plug constitute trade secrets.[4] On this question, the Court in ***Hickory Specialties, Inc. v. B&L Laboratories, Inc., supra,*** said:

> Trade secrets are defined in ***Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.,*** 255 F.Supp. 645 (E. D. Mich. 1966):
>
>> [T]he weight of modern authority . . . holds that *a trade secret may consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it.* [Citations omitted.] P. 653.
>
> On the issue of secrecy, the Court continued:
>
>> The subject matter of a trade secret must be secret. *Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets.* Similarly, matters disclosed by a marketed product cannot be secret. However, the proprietor of the business may communicate the secret to employees involved in its use, or to others pledged to secrecy. *Ibid.*

592 S.W.2d at 586-87 (emphasis added).

Determination of whether information constitutes a "trade secret" is a question of fact. *See Venture Express v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998); *Arkansas Dailies, Inc. v. Dan*, 260 S.W.2d 200, 204 (Tenn. Ct. App. 1953). In determining this factual question, Tennessee Courts have invoked the Restatement of Torts § 757, comment b (1939)[5], which provides:

---

[4] We note that the Tennessee Uniform Trade Secrets Act, codified at T.C.A. § 47-25-1701-1709, became effective July 1, 2000. The Compiler's Notes indicate that the Act does not apply to misappropriations occurring before the effective date of the Act or to misappropriations which have continued after the Act's effective date. *See* T.C.A. § 47-25-1701 (2001). For these reasons, the Act is inapplicable to the case at bar.

[5] This list can still be found in the Restatement of Law, Third, Unfair Competition § 39, Definition of Trade Secret, comment d (1995).

> Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See, e.g., Venture Express*, 973 S.W.2d at 602.

Odyssey has offered evidence that it had the ability to take Eagle Vision's plug and, utilizing a device called an "optical comparator" in conjunction with Eagle Visions drawings, manufacture a sample plug, with which Eagle Vision's representatives were "extremely impressed." It was the quality of this sample plug which convinced Eagle Vision to enter into a vendor-vendee relationship with Odyssey. Based upon this evidence, Odyssey argues that the specifications of Eagle Vision's punctum plug are "easily ascertainable," and, therefore, not trade secrets.

On the other hand, Eagle Vision presented evidence that the Plug's design specifications are not "easily ascertainable" from a visual inspection of its product. Eagle Vision claims that the device capable of measuring the Plug's dimensions is "highly sophisticated," and utilizes a very "tricky" process. Eagle Vision explains that, even with such difficult measurements, the device's dimensional tolerances are not disclosed by a visual inspection of the product, and would have been "impossible" for Odyssey to discover.

As we have noted above, one of the factual considerations in the determination of what constitutes a trade secret is "the ease or difficultly with which the information could be properly acquired or duplicated by others." Restatement of Torts § 757, comment b. This Court, in *Hickory Specialties*, noted that, if a matter is "disclosed by a marketed product [it] cannot be a secret." 592 S.W.2d at 587. However, whether something that can only be disclosed by using sophisticated equipment and a complex process is, nonetheless, "easily ascertainable," is not a determination properly made on a motion for summary judgment.

In the case at bar, we hold that the question of whether Eagle Vision's punctum plug design constitutes a "trade secret" is an issue of material fact which precludes summary judgment. The parties themselves dispute at least one fact we hold is material to the resolution of this case: whether Odyssey misappropriated tolerance data it gathered for use with CAD software.

Eagle Vision's last issue for review concerning Eagle Vision's "set-off" claim has previously been dismissed by Order of this Court filed January 15, 2002.

The order of the trial court granting summary judgment to Defendants is reversed.  The case is remanded to the trial court for such further proceedings as may be necessary.  Costs of the appeal are assessed against Appellees, Odyssey Medical, Inc. and Gary Tatge.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.